# LEMMON *v.* PEOPLE.

The Revised Statutes ( *tit.* 7, *ch.* 20, *part* 1, *as amended by ch.* 247 *of* 1841), render free every person formerly held as a slave who is introduced into this State by the voluntary act or consent of his master.

They have this operation upon slaves not fugitives from service but brought into this State in the course of transit from one slave State to another, without any intention on the part of the master of remaining any longer than is necessary find the opportunity for pursuing his journey.

Lemmon *v.* The People.

Whether the statute in its terms or construction applies to the case of slaves on board of a coasting vessel which has been driven within the navigable waters of this State by stress of weather or other marine casualty, *quere.*

Every State, except as it may have limited its power by express compact, has the exclusive right to determine and regulate the *status* or social and civil condition of all persons who may at any time be within its jurisdiction.

The law of nations or principles of comity are applied in determining such *status* only from the presumed consent of the political government of the State where they are invoked. When the legislative power has declared its will upon the subject, the judicial tribunals are bound to obey its directions unless they are in conflict with the Constitution of the United States.

The Federal Constitution recognizes the plenary and exclusive power of the States in this particular, by the express limitation thereof in the case of fugitives from service.

The adoption of the provision on that subject is evidence of the understanding of the parties to the compact that in its absence even a fugitive would be emancipated upon reaching a free State; not merely by force of laws prohibiting slavery, but for want of positive law subjecting him to a condition abhorred by the common law and the law of nations. *A fortiori* would a slave become free if voluntarily brought by his master into a free State.

The clause in respect to fugitives does not extend beyond the case of the actual escape of one owing service in one State to another.

The provision of the Federal Constitution, that the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States, secures to a citizen of Virginia, irrespective of his presence or absence, the same rights, and no others, pertaining to a citizen of this State in that quality, and subjects him to the same disabilities.

Its effect is simply to relieve him from any disabilities of alienage which would otherwise attach, and to prevent any legislation discriminating against him to the advantage of natural citizens, but it does not enable him to carry into another State the legal institutions, or any of them, of the State of which he was primarily a citizen.

The statute of this State is not void as infringing upon the power of Congress to regulate commerce between the States. It seems (per WRIGHT, DAVIES, BACON and WELLES, Js.), that the action of the several States to exclude slaves from their limits cannot be controlled by Congress under this or any other power conferred by the Constitution. But if Congress has power to regard persons as the subjects of commerce, and upon that assumption to regulate their transportation, it is sufficient (per DENIO, J.) that Congress has not undertaken to regulate commerce between the States by land or otherwise than when carried on wholly by coasting vessels, and that the present state of federal legislation does not raise any conflict between it and the laws of this State.

Accordingly, slaves brought from Virginia to New York by sea, and there landed with the intention of embarking upon a new voyage to Texas, are thereby made free.

APPEAL from the Supreme Court. On the 6th day of November, 1852, Louis Napoleon, a colored citizen of this State, made application upon a sufficient petition and affidavit to Mr. Justice PAINE of the Superior Court of the city of New York, for a writ of *habeas corpus* to be directed to one Jonathan Lemmon and the keeper of house No. 3 Carlisle street, New York, requiring them to bring before said justice the bodies of eight colored persons, one man, two women and five children, who on the day preceding were confined and restrained of their liberty on board the steamer City of Richmond, in the harbor of New York, and were taken therefrom on the night of that day to No. 3 Carlisle street, and there detained under the pretence that they were slaves.

The writ accordingly issued, and on the same day one of the constables of the city of New York brought up the eight colored persons, who appeared to be known only by their christian names as Emeline, Robert, Lewis, Amanda, Nancy, Ann, Lewis and Edward. Lemmon made a return to the writ under oath, in which he averred that the eight persons named were the slaves and property of Juliet Lemmon his wife, who had been the owner of such persons as slaves for several years, she being a resident and citizen of the State of Virginia: that service and labor as slaves was due by them under the Constitution and laws of Virginia: " that the said Juliet, with her said slaves, persons or property, is now *in transitu* or transit from the State of Virginia aforesaid to the State of Texas, the ultimate place of destination and another slaveholding State of the United States of America, and that she was so on her way *in transitu* or transit when the aforesaid eight persons or slaves were taken from her custody or possession under the writ of *habeas corpus.*" * * * * " that the said Juliet never had any intention of bringing the said slaves or persons into the State of New York to remain therein, and that she did not bring them into said State in any manner nor for any purpose whatever,

except *in transitu* or transit from the State of Virginia afore-said through the port or harbor of New York, on board of steamship for their place of destination, the State of Texas aforesaid: that the said Juliet, as such owner of the aforesaid slaves or persons, was at the time they were taken from her as aforesaid, on the writ of *habeas corpus*, and she thereby deprived of the possession of them, passing with them through the said harbor of New York, where she was compelled by necessity to touch or land, without, on her part, remaining or intending to remain longer than necessary:" * * * "that the said slaves, sailing from the port of Norfolk in the said State of Virginia, on board the steamship City of Richmond, never touched, landed nor came into the harbor or State of New York except for the mere purpose of passage and transit from the State of Virginia, aforesaid, to the State of Texas, aforesaid, and for no other purpose, intention, object or design whatever: that the said Juliet with her said slaves was compelled by necessity or accident to take passage in the steamship City of Richmond, before named, from the aforesaid port of Norfolk and State of Virginia for the State of Texas aforesaid, the ultimate place of destination." The return also denied any intention, on the part of Mrs. Lemmon or her husband, of selling the negroes.

To this return the relator orally interposed a general demurrer. Mr. Justice PAINE held the case under advisement until the 13th of November, 1852, when he discharged the colored Virginians.

Lemmon sued out a writ of *certiorari* from the Supreme Court, where the proceedings were reviewed at general term in the first district, and the order of Mr. Justice PAINE was affirmed in December, 1857. Lemmon appealed to this court.

*Charles O'Conor*, for the appellant.

I. Except so far as the State of New York could rightfully, and without transcending restraints imposed upon her sovereignty by the Constitution of the United States, forbid the *status*

of slavery to exist within her borders in the person of an African negro, and except so far as she has, in fact, expressly or impliedly forbidden it by actual legislation, an African negro may be lawfully held in that condition in this State.   1. The ancient general or common law of this State authorized the holding of negroes as slaves therein.   The judiciary never had any constitutional power to annul, repeal or set aside this law; and, consequently, it is only by force of some positive enactment of the legislative authority that one coming into our territory with slaves in his lawful possession could suffer any loss or diminution of his title to them as his property.   (1.) In every known judgment, argument or opinion of court, judge or counsel relating to the subject, it is admitted in some form, that at an early period negro slavery existed under the municipal law in each one of the thirteen original States which formed this Republic, by declaring its independence in 1776, and adopting its Constitution in 1789.   By what means it had its first reception and establishment in any of them as an institution sanctioned by law, may not be historically traceable; but in most, if not all of them, and certainly in New York, it was expressly recognized by statute prior to the time when the States themselves asserted their independence. (28 *October*, 1806, *Van Schaick's Laws,* 69; 29 *October*, 1733, *id.,* 157; *Colonial Slave Act of N. Y., March* 8, 1773; *Jack* v. *Martin*, 12 *Wend.*, 328; *Jackson* v. *Bulloch*, 12 *Conn.*, 42; *id.,* 61; *Commonwealth* v. *Aves,* 18 *Pick.*, 208, 209; *Scott* v. *Sandford,* 19 *How.*, 407, 408; *Hargrave's Argt., point 5th,* 20 *State Trials,* 60; *Per* McLEAN, J., 16 *Pet.,* 660; 15 *id.,* 507.)   (2.) Negro slavery never was a part of the municipal law of England, and consequently it was not imported thence by the first colonists.   Nor did they adopt any system of villenage or other permanent domestic slavery of any kind which had ever existed in England or been known to or regulated by the laws or usages of that kingdom.   They were a homogeneous race of the free white men; and in a society composed of such persons, the slavery of its own members, endowed by nature with mental and physical equality, must ever be repugnant to an enlightened sense of justice.   Of

Lemmon *v*. The People.

course, the colonists abhorred it, saw that it was not suited to their condition and left it behind them when they emigrated. (*Doctor and Student Dialogue*, 2 *Ch.*, 18, 19 ; *Wheaton* v. *Donaldson*, 8 *Pet.*, 659 ; *Van Ness* v. *Pacard*, 2 *Pet.*, 444 ; 1 *Kent Com.*, 373 ; *Const. N. Y.*, art. 1, § 17 ; *Neal* v. *Farmer*, 9 *Cobb's Geo. R.*, 562, 578.)  (3.) As neither the political bondage nor the domestic slavery which the European by fraud and violence imposed upon his white brethren ever had a legal foothold in the territory now occupied by these States, the inflated speeches of French and British judges and orators touching the purity of the air and soil of their respective countries, whatever other purpose they may serve, are altogether irrelevant to the inquiry what was or is the law of any State in this Union on the subject of negro slavery. (*French Eloq.*, *A. D.*, 1738, 20 *State Trials*, 11, *note; English Eloq.*, *A. D.*, 1762, 2 *Eden*, 117, Ld. NORTHINGTON ; *Id.*, 1765, 1 *Bl. Com.*, 127, 124 ; *Id.*, 1771, 20 *State Trials*, 1 Ld. MANSFIELD ; *Scotch Eloq.*, 1778, *id.*, 6, *note; Irish Eloq.*, 1793, *Rowan's Trial*, *Curran;* Judge MCLEAN's *criticism in Dred Scott*, 19 *How.*, 535 ; Lord STOWELL's *criticism*, 2 *Hagg. Ad.*, 109.)  (*a.*) The only argument against negro slavery found in the English cases at all suitable for a judicial forum rests on the historical fact that it was unknown to the English law. Mr. Hargrave, in Somerset's case, showed that white Englishmen were alone subject to the municipal slave laws of that country at any time ; that negro slavery was a new institution which it required the legislative power to introduce. (20 *State Trials*, 55 ; *Com.* v. *Aves*, 18 *Pick.*, 214.)  (*b.*) Lord HOLT and Mr. Justice POWELL were Mr. Hargrave's high authority for the proposition that whilst the common law of England recognized white English slaves or villeins and the right of property in them ; yet it "took no notice of a negro."  That a white man might be a villein in England," but "that as soon as a negro comes nto England he became free." It was only negro liberty that the know-nothingism of English and French law established. English and French air had not its true enfranchising purity till drawn through the nostrils of a negro.  White slaves had long respired it without their *status* being at all affected. (*Smith*

· **v.** *Brown*, 2 *Salk.*, 666; 20 *State Trials*, 55, *note.*)   (*c.*) Lord MANSFIELD said in Somerset's case, "The state of slavery is of such a nature that it is incapable of being introduced on any reason, moral or political, but only by positive law," and negrophilism has been in raptures with him ever since.   Nevertheless it was a bald inconsequential truism.   It might be equally well said of any other new thing not recognized in any known existing law. (*Per* ASHHURST, J., 3 *J. R.*, 63.) (4.) The judiciary never had power to annul, repeal or set aside the slave law of this State which we have shown existed with the sanction of the Legislature prior to the Revolution.   (*a.*) Judicial tribunals in this country are a part of the government, but by the genius of our institutions, and the very words of our fundamental charters, they are restrained from any exercise of the law-making power.   That governmental function is assigned to a separate department.   (*b.*) By this strict separation of governmental powers, we have given form and permanency to a maxim of politico-legal science always acknowledged by the sages of the English law in theory, though often violated in practice.   (*c.*) For proofs of this acknowledgment we refer to the habitual definition of judicial power—*jus dare et non jus facere.*   Again, the wise and learned Sir JONATHAN EARDLEY WILMOT says: "Statute law and common law originally flowed from the same fountain—the Legislature.   Statute law is the will of the Legislature; the common law is nothing else but statutes worn out by time; all our law begun by consent of the Legislature; and whether it is now law by usage or by writing it is the same thing." (*Collins* v. *Blantern*, 2 *Wils.*, 348; 1 *Kent*, 472.) This is sound doctrine; but it has often been departed from in practice.   (*d.*) In some instances the departure has been very striking.   The legislative authority of Great Britain, in 1285, sought by the celebrated statute *de donis* to make entailed lands absolutely inalienable.   As far as the plain and direct expression of its sovereign will by the supreme law-making power could have that effect, they were rendered inalienable.   The judges, without a shadow of constitutional right, contrived the absurd and irrational fiction of

a common recovery, and thereby virtually repealed the statute. (2 *Bl. Com.*, 116, *Per* MANSFIELD; 1 *Burr.*, 115, Ld. Ch. J. WILLES; *Willes*, 452.) The English legislature was governed by what we, with our present lights, may deem a pernicious policy, tending to restrain commerce in land, to tie it up in few hands, and to draw into operation numerous social evils. The unfettering of estates by the English judges, through the devices to which they resorted, had its origin in a wise regard for the interests of the people; but in them, it was mere trick and rank usurpation. So Lord ELDON, from his place as President of the House of Lords, at a period when constitutional law was better understood in England, in pronouncing the judgment upon the case of the Queensberry leases (1 *Bligh's P. Rep.*, 1st series, 435, A. D. 1819), says: "The power of judges in this respect may be doubted. Upon that subject, as it applies to English law, I have formed an opinion that the judges of *this age* in England would not have been permitted to get rid of the statute of English entails as judges of that age did soon after the passing of the statute *de donis*. (38 *Eng. L. and Eq.*, 444.) (e.) Those lawyers who have failed to perceive, as Lord ELDON did, the necessity of keeping separate the great departments of the government, whose professional pride was greater than their knowledge of constitutional jurisprudence, have frequently boasted of a tendency amongst the English juris-consults and judges to defeat what to them seemed impolitic and unjust resolutions of the legislative department. They erred. Far better that supposed mischiefs should exist for a time by the ill-advised sanction of the Legislature than that, by usurping powers not granted, the high priest of justice should defile himself and the temple in which he officiates by the sin of willfully violating the fundamental law. Error should not be combated by error, by crime, or by ingeniously conceived fraudulent devices and evasions, but by fair argument and open remonstrance addressed to those whom the Constitution has invested with the sole power of orderly and legitimate correction. An instance of this ill-considered self-gratulation may be found in the otherwise admirably written

argument of Mr. HARGRAVE, as counsel for the negro Somerset before Lord MANSFIELD. The last sentence of that argument, vaguely to be sure, and, perhaps, somewhat covertly, commends the astuteness of the English judges in circumventing the lord under the system of English villenage, by which they gradually undermined that part of the ancient law of England. (20 *Howell's State Trials*, 67; *Id.*, 27.) Negro slavery in the West Indies was sanctioned by numerous English statutes. This afforded an argument certainly of much force in favor of·permitting an English subject, who lawfully held slaves in that part of the British dominions, temporarily to visit England with his bondman. The argument was opposed by this appeal to judicial pride; it was overruled by the dictum of a judge much more renowned for his tendencies to usurp the power of making law than for any inclination to diminish prerogative or to defend the liberty of his white fellow subjects. The pride of office, the pride of learning and an ostentatious vanity, rather than any tenderness for the rights and enjoyments of the lowly, dictated the loose declamation by which he installed himself as the champion of negro emancipation. 2. The judicial department has no right to declare negro slavery to be contrary to the law of nature, or immoral, or unjust, or to take any measures or introduce any policy for its suppression founded on any such ideas. Courts are only authorized to administer the municipal law. Judges have no commission to promulgate or enforce their notions of general justice, natural right or morality, but only that which is the known law of the land. (1 *Kent's Com.*, 448; *Doctor and Student Dialogue*, 1 *ch.*, 18, 19; *per* MAULE, J., 13 *Ad. & Ell.*, *N. S.*, 387, *note.*) 3. In the forensic sense of the word law, there is no such thing as a law of nature bearing upon the lawfulness of slavery, or indeed upon any other question in jurisprudence. The law of nature is in every juridical sense, a mere figure of speech. In a state of nature, if the existence of human beings in such a state may be supposed, there is no law. The prudential resolves of an individual for his own government, do not come under the denomination of law.

Law, in the forensic sense, is wholly of social origin. It is a restraint imposed by society upon itself and its members. (*Rutherforth's Inst.*, B. 1, *ch.* 1, § 6, 7; 1 *Bl. Com.*, 43; 1 *Kent*, 2; *Wheaton's Elements of Int. Law*, 2, 19; *Cooper's Justinian*, *notes*, 405; *Bowyer on Public Law*, 47, *and onward*.) (1.) If there was any such thing as a law of nature, in the forensic sense of the word law, it must be of absolute and paramount obligation in all climes, ages, courts and places. Inborn with the moral constitution of man, it must control him everywhere, and overrule as vicious, corrupt and void every opposing decree or resolution of courts or legislatures. And accordingly BLACKSTONE, repeating the idle speech of others upon the subject, tells us that the law of nature is binding all over the globe; and that no human laws are of any validity if contrary to it. (1 *Wendell's Blackstone*, 40, 41, 42, *and notes*.) Yet, as the judiciary of England have at all times acknowledged negro slavery to be a valid basis of legal rights, it follows either that such slavery, in the practical judgment of the common law, is not contrary to the law of nature, or if it be, that such law of nature is of no force in any English court. (*Acc. Bouvier's Inst.*, § 9; *Brougham Ed. Rev.*, *Apl.* 1858, 235.) (2.) The common law judges of England, whilst they broke the fetters of any negro slave who came into that country, held themselves bound to enforce contracts for the purchase and sale of such slaves, and to give redress for damages done to the right of property in them. This involves the proposition that there was no paramount law of nature which courts could act upon prohibiting negro slavery. (*Madrazo* v. *Willes*, 3 B. & Ald., 353; 18 *Pick.*, 215; *Smith* v. *Brown*, *Salk.*, 666; *Cases cited in note*, 20 *State Trials*, 51; *The Slave Grace*, 2 *Hagg. Adm.*, 104.) (3.) The highest courts of England and of this country having jurisdiction over questions of public or international law, have decided that holding negroes in bondage as slaves is not contrary to the law of nations. (*The Antelope*, 10 *Wheat.*, 66; 18 *Pick.*, 211; *The Slave Grace*, 2 *Hagg. Adm.*, 104, 122.) (4.) When Justinian says in his Institutes (*book* 1, *tit.* 2, § 2), and elsewhere, that slavery is contrary to the law of nature,

he means no more than that it does not exist by nature but is introduced by human law, which is true of most if not all other rights and obligations. His definition of the law of nature (*book* 1, *tit.* 2) *de jure naturali* proves this; his full sanctions of slavery in *book* 1 (*tit.* 3, § 2, *tit.* 8, § 1) confirm it. (*Cushing's Domat.*, § 97; *Bowyer on Public Law*, 48.) (5.) All perfect rights, cognizable or enforceable as such in judicial tribunals, exist only by virtue of the law of that State or country in which they are claimed or asserted. The whole idea of property arose from compact. It has no origin in any law of nature as supposed in the court below. (5 *Sandf.*, 711; *Rutherforth's Inst.*, *book* 1, *ch.* 3, §§ 6, 7.) (6.) The law of nature spoken of by law writers, if the phrase has any practical import, means that morality which its notions of policy leads each nation to recognize as of universal obligation, which it therefore observes itself and, so far as it may, enforces upon others. It cannot be pretended that there ever was in England, or that there now is in any State of this Union, a law, by any name, thus outlawing negro slavery. The common law of all these countries has always regarded it as the basis of individual rights; and statute laws in all of them recognized and enforced it. (*The Slave Grace*, 2 *Hagg. Adm.*, 104; *Per* SHAW, Ch. J., 18 *Pick.*, 215; 1 *Kent*, 2, 3; 3 *id.*, 2; 2 *Wood's Civil Law*, 2.) (*a.*) No civilized state on earth can maintain this absolute outlawry of negro slavery; for in some of its forms slavery has existed in all ages; and no lawgiver of paramount authority has ever condemned it. (*Cooper's Justinian, notes*, 410, *Inst.*, *book* 1, *tit.* 3; *Per* BARTLEY, Ch. J., 6 *Ohio N. S.*, 724; Senator BENJAMIN, 1858.) (*b.*) It has never been determined by the judicial tribunals of any country that any right, otherwise perfect, loses its claim to protection by the mere fact of its being founded on the ownership of a negro slave. (7.) The proposition that freedom is the general rule and slavery the local exception, has no foundation in any just view of the law as a science. Equally groundless is the distinction taken by Judge PAINE between slave property and other movables. (*a.*) Property in movables does not exist by nature, neither is

there any common law of nations touching its acquisition or transfer. (*Bowyer on Universal Public Law*, 50.) (*b.*) Every title to movables must have an origin in some law. That origin is always in and by the municipal law of the place where it is acquired, and such law never has *per se* any extra-territorial operation. (*c.*) When the movables, with or without the presence of their owner, come within any other country than that under whose laws the title to them was acquired, it depends on the will of such latter State how far it will take notice of and recognize, *quoad* such property and its owner, the foreign law. (*Bank of Augusta* v. *Earle*, 13 *Pet.*, 589.) (*d.*) It has become a universal practice among civilized nations to recognize such foreign law except so far as it may be specially proscribed. This usage amounts to an agreement between the nations, and hence the idea of property by the so-called law of nations. (*e.*) Hence it will be seen that property in African negroes is not an exception to any general rule. Upon rational principles, it is no more local or peculiar than other property. And there is so much of universality about it that in no civilized State or country could it be absolutely denied all legal protection. 4. In fact there is no violation of the principles of enlightened justice nor any departure from the dictates of pure benevolence in holding negroes in a state of slavery. (1.) Men, whether black or white, cannot exist with ordinary comfort and in reasonable safety otherwise than in the social state. (2.) Negroes, alone and unaided by the guardianship of another race, cannot sustain a civilized social state. (*a.*) This proposition does not require for its support an assertion or denial of the unity of the human race, the application of Noah's malediction (9 *Geo.*, 582), or the possibility that time has changed and may again change the Ethiopian's physical and moral nature. (*b.*) It is only necessary to view the negro as he is, and to credit the palpable and undeniable truth, that the latter phenomenon cannot happen within thousands of years. For all the ends of jurisprudence this is a perpetuity. (*Facciolati's Latin Lexicon Aethiops.*) (*c.*) The negro never has sustained a civilized social organization, and that he never can is

sufficiently manifest from history. It is proven by the rapid though gradual retrogression of Hayti toward the profoundest depths of destitution, ignorance and barbarism. (*McCulloch's Geo., Hayti*, 693, 694; *De Bow's Rev., vol.* 24, 203.) (*d.*) That, alone and unaided, he never can sustain a civilized social organization is proven to all reasonable minds by the fact that one single member of his race has never attained proficiency in any art or science requiring the employment of high intellectual capacity. A mediocrity below the standard of qualification for the important duties of government, for guiding the affairs of society, or for progress in the abstract sciences, may be common in individuals of other races; but it is universal amongst negroes. Not one single negro has ever risen above it. (*Malte Brun's Geo., book* 59, 8; *Gregoire's Literature of the Negroes; Biog. Univ. Supt., vol.* 56, 83, *Gregoire.*) (*e.*) It follows that in order to obtain the measure of reasonable personal enjoyment and of usefulness to himself and others for which he is adapted by nature, the negro must remain in a state of pupilage under the government of some other race. (*f.*) He is a child of the sun. In cold climates he perishes; in the territories adapted to his labors, and in which alone his race can be perpetuated, he will not toil save on compulsion, and the white man cannot; but each can perform his appointed task—the negro can labor, the white man can govern. (3.) Morality, or those dictates of enlightened reason which have sometimes been called the law of nature, do not oblige any man to serve another without an equivalent reward for the service rendered. (*a.*) The obligations of charity form no exception to this rule. Charity enjoins gratuitous service to those who are unable to repay; it is not due to sturdy indolence. (*Doctor and Student Dialogue*, 1, *ch.* 6.) (*b.*) The universal voice of mankind concedes to the parent a right to the profit and pleasure which may be derived by him from the services of his minor child as a due return for guardianship and nurture. (*c.*) Who shall deny the claim of the intellectual white race to its compensation for the mental toil of governing and guiding the negro laborer? The learned and skillful

statesman, soldier, physician, preacher or other expert in any great department of human exertion where mind holds dominion over matter, is clothed with power, and surrounded with materials for the enjoyment of mental and physical luxuries, in proportion to the measure of his capacity and attainments. And all this is at the cost of the mechanical and agricultural laborer, to whom such enjoyments are denied. If the social order, founded in the different natural capacities of individuals in the same family, which produces these inequalities, is not unjust, who can rightfully say of the like inequality in condition between races differing in capacity, that it is contrary to a law of nature, or that the governing race who conform to it are guilty of fraud and rapine, or that they commit a violence to right reason which is forbidden by morality? (4.) "*Honeste vivere, alterum non lædere et suum cuique tribuere,*" are all the precepts of the moral law. The honorable slaveholder keeps them as perfectly as any other member of human society. (*Inst., book* 1, *tit.* 1, § 3; 1 *Bl. Com.,* 40; 9 *Georgia,* 582.) (*a.*) The cruelties of vicious slave owners and the horrors of the slave trade are topics quite irrelevant. It is universal experience that wealth and power afford occasion for the development of man's evil propensities; but as they are also the necessary means of his improvement, they cannot be called evils in their own nature. (*b.*) The tone of mind, which, arrogating to itself superior purity of life and a higher moral tone than in the then existing state of knowledge could be supposed to have existed among the guests at the marriage in Cana of Galilee (*John, ch.* ii), enjoins, as a duty, total abstinence from wine, is well kept up in the assumption of a political and moral excellence beyond the mental reach of our sires, and the consequent demand for an immediate abolition of negro slavery. (*c.*) Certain assumptions of anti-slavery agitators have been too much indulged by the moderate, peaceful, and conservative. Ch. J. MARSHALL let pass uncondemned their irrelevant triviality about the law of nature (6 *Pet. Cond.,* 36; 10 *Wheat.,* 114), and Ch. J. TANEY concedes to them that the negro race, merely because denied political rights, is to be regarded as "unfortu-

nate" (19 *How.*, 407), and "unhappy" (*id.*, 409). The fathers of the Republic, when forming a temporary league, in the face of the foe and on the eve of battle (7 *Cush.*, 295), declined to peril all by delay and discord upon a scruple about inserting in the compact an unnecessary word (19 *How.*, 575); but when those to whom for peace sake "an inch" has been thus conceded, proceeding on the "take an ell" principle, demand, as a consequence of the precedent, the power to destroy, we must withdraw all such concessions and go back to principles.

II. The unconstitutional and revolutionary anti-slavery resolution[1] of April, 1857, cannot retroact so as to affect this case. (*Vol.* 2, 797; *Westminister Review, vol.* 45, 76–98, *article Manifest Destiny.*) Prior to that time, no legislative act of this State had ever declared that to breathe our air or touch our soil should work emancipation *ipso facto;* nor had any statute been enacted which, by its true interpretation, denied to our fellow citizens of other States an uninterrupted *transitus* through our territory with their negro slaves. 1. The special injunctions and guarantees of the Federal Constitution secure to citizens of the several States free intercourse with all parts of the Republic. 2. Even inter-state comity, in its simplest form, awards a free transit to members of a friendly State with their families and rights of property, without disturbance of their domestic relations. (*Curtis Arg.*, 18 *Pick.*, 195, *and cases cited;* PAINE, J., 5 *Sand.*, 710; *McDougall Arg.*, 4 *Scam.*, 467, 468.) 3. Whatever others may do, no American judge can pronounce slave property an exception to this rule upon the general ground that slavery is immoral or unjust. Every American citizen is bound by the Constitution of the United States to regard it as being free from any moral taint which could affect its claims to legal recognition and protection, so long as any State in the Union shall uphold it. (1.) The provisions of the Federal Constitution for its protection cannot otherwise be kept in candor and good faith. (2.) In this spirit, faithful Christians and

---

[1] THE PEOPLE OF THIS STATE WILL NOT ALLOW SLAVERY WITHIN HER BORDERS IN ANY FORM OR UNDER ANY PRETENCE, OR FOR ANY TIME, HOWEVER SHORT.
                              Joint Resolution of April 16, 1857

even honorable unbelievers keep all lawful contracts. (3.) Portia's mode of keeping promises (*Merchant of Venice*, act 4, *scene* 1), is allowable only in respect to pacts having the form of contracts, but which are of no binding force or obligation in law or morals. (4.) The American citizen, who, applying Shakspeare's doctrine, carries in his bosom a chapel illuminated by the "higher law," and devoted to those infernal deities, Evasion and Circumvention, may be justified if the constitutional compact be void; but if it be valid, he violates honor and conscience. It may be, however, that his devices are too subtle and ingenious to be reached by ordinary legal sanctions. (*Last sentence in re Kirk*, 1 *Park. Cr. Cases*, 95; *Commonwealth* v. *Fitzgerald*, 7 *L. R.*, 379; *Sim's Case*, 7 *Cush.*, 298; 1 *R. S.*, 657, §§ 1, 16.)

III. The act of March 31st, 1817, as revised in 1830, even with the modification of its effect wrought by the repeal of its exceptions in 1841, rightly understood, does not deny such right of passage. (*Laws of* 1817, 138, §§ 9, 15, 16, 17; 1 *R. S.*, 656, §§ 1–16; *Laws of* 1841, 227, § 1.) 1. The words "*imported, introduced, or brought* INTO this State," unless extended by construction far beyond their import, do not apply to the mere *transitus* of a slave, in custody of a citizen of a slaveholding State being his owner, when quietly passing through this State on lawful occasion and without unnecessary delay. (*Laws of* 1817, 136, § 9; *Laws of* 1841, 227; *Opinion in this case*, 5 *Sand.*, 716.) (1.) The repeal by the act of 1841 of the special privileges given by sections 3–7 inclusive of the act of 1817, in the view most adverse to the slave owner, merely left the words "imported, introduced or brought into" to be applied according to their natural import without those sections. So construed they would not extend to a mere carrying through the State. The word "INTO" differs in meaning from the word "WITHIN" as used in the legislation of 1857, and marks the characteristic difference between it and that of 1817. (2.) It is impossible to give to the legislation of 1817 the comprehensive effect which was designed by the treasonable resolution of 1857. All will admit that a fugitive

from slavery in Virginia, found in Vermont, may be carried back through New York under an extradition certificate. This would seem to prove that carrying through the State was not, in the judgment of the Legislature, a bringing into the State within the meaning of the act of 1817. (*Curia by* STORY, J., 16 *Pet.*, 624; *Curia by* SHAW, J., 18 *Pick.*, 224.)

IV. The State of New York cannot, without violating the Constitution of the United States, restrain a citizen of a sister State from peaceably passing through her territory with his slaves or other property on a lawful visit to a State where slavery is allowed by law. (1.) Congress has power "to regulate commerce with foreign nations, and among the several States and with the Indian tribes." (*Const. U. S., art.* 1, § 8, *subd.* 3.) (2.) This power is absolutely exclusive in Congress, so that no State can constitutionally enact any regulation of commerce between the States whether Congress has exercised the same power over the matter in question or left it free. (*Passenger Cases,* 7 *How. U. S. R.,* 572; *per* MCLEAN, J., 7 *How.*, 400; *per* WAYNE, J., *and the Court,* 7 *How.*, 410, 411; *per* MCKINLEY, J., 7 *How.*, 455; *per* STORY, J., *City of N. Y.* v. *Miln,* 11 *Pet.*, 158, 159, 156; *Per* SHAW, Ch. J., *Sim's Case,* 7 *Cush.*, 299, 317.) (1.) At all events, the States have not reserved the right to prohibit and thus destroy commerce or any portion of it. (2.) The judgment below asserts that a citizen of Virginia, in possession of his slave property, cannot pass through the navigable waters of a non-slaveholding State on board of a coasting steamer enrolled and licensed under the laws of Congress. without risk of having his vessel arrested under State law and his property torn from him by force of Lord MANSFIELD's *obiter dictum* in Somerset's case. (2 *Hagg.*, 107; *Gibbons* v. *Ogden,* 9 *Wheat.*, 1; *Com.* v. *Fitzgerald,* 7 *L. R.*, 381; *In re Kirk.*, 1 *Park. Cr. Cas.,* 69, *cannot be sustained.*) (3.) That proposition cannot be maintained. Each State is required to give full faith and credit to the public acts of every other (*art.* 4, § 1); to surrender to every other fugitives from its justice, or from any personal duty (*art.* 4, § 2, *sub.* 2, 3). No citizen can be deprived of his privileges and immunities by the

action of a State other than his own. (*Id.*, § 1.) Commerce between the States is placed under the exclusive control of Congress. (*Art.* 1, § 8, *subd.* 3.) And Congress itself is forbidden to impose any burden on the external trade of a particular State, or to burden or prefer it in any way. (*Const., art.* 1, § 8, *subd.* 2; § 9, *subd.* 5.) (4.) Until the present case, it seems to have been universally conceded, and, at all events, it is clear in law, that a citizen of any State in the Union may freely pass through an intermediate State to the territory of a third without sacrificing any of his rights. (*Per* SHAW, Ch.-J., 18 *Pick.*, 224, 225; *per* CURREN, *Willard* v. *People*, 4 *Scam.*, 468; *Sewell's Slaves*, 3 *Am. Juris.*, 406, 407; 7 *How. U. S. R.*, 461, *Passenger cases.*) 3. The word "commerce," as it is used in this constitutional grant of exclusive power to Congress, includes the transportation of persons and the whole subject of intercourse between our citizens of different States as well as between them and foreigners. Consequently, no State can impose duties, imposts or burdens of any kind, much less penal forfeitures, upon the citizens of other States for passing through her territories with their property, nor can any State interrupt or disturb them in such passage. (*Passenger Cases*, 7 *How. U. S. R.*, 572; *per* MCLEAN, J., 7 *How.*, 401, 405, 407; *per* WAYNE, J., *and the court*, 7 *How.*, 412, 413, 430, 352; *per* WAYNE, J., 7 *How.*, 433, 435; *per* CATRON, J., 7 *How.*, 450, 451; *per* MCKINLEY, J., 7 *How.*, 453; *per* GRIER, J., 7 *How.*, 461, 463, *fourth point*, 464; *per* BALDWIN, J., *Groves* v. *Slaughter*, 15 *Pet.*, 510, 511, 513, 515, 516, *in point as to slaves*; *Argt. of* Mr. CLAY, 15 *Pet.*, 489, Mr. WEBSTER, 495; R. J. WALKER, *contra, app.*, 48 *and onward*; *Curia per* MARSHALL, J., *Gibbons* v. *Ogden*, 5 *Pet., Cond.*, 567.) 4. This doctrine does not preclude a State from exercising absolute control over all trading of any kind within her borders; nor from any precautionary regulations for the preservation of her citizens or their property from contact with any person or thing which might be dangerous or injurious to their health, morals or safety. (*Per* MCLEAN, J., 7 *How.*, 402, 403, 406, 408; *per* WAYNE, J., 7 *How.*, 417, 424, 426, 428; *per* GRIER, J., 7

*How.*, 457; *per* BALDWIN, J., 14 *Pet.*, 615; *per* STORY, J., 16 *Pet.*, 625; 5 *How.*, 569 570, 571; *Gibbons* v. *Ogden*, 9 *Wheat.*, 1; 5 *Pet.*, *Cond.*, 578.)

V. The constitutional guaranty to "the citizens of each State," that they "shall be entitled to all privileges and immunities of citizens *in* the several States" (*art.* 4, § 2, *subd.* 1) affords the citizen of any State, peacefully passing through another, a right to immunity from such disturbance as the plaintiff suffered from the order now under review. 1. This section would lose much of its force and beneficial effect if it were construed to secure to the non-resident citizen in traveling through a State only such "rights" as such State may allow to its own citizens. Its object was to exempt him from State power, not to subject him to it. (1.) Class legislation is deemed perfectly legitimate. A State may impose grievous burdens on its own citizens of particular classes, say those of foreign birth, of German origin, over or under a particular age, owning slaves any where, or pursuing a particular occupation, &c. It may establish an agrarian law. Perhaps Utah might visit heavy penalties upon any of its male citizens for breathing its pure air or touching its pure soil without having at least six wives; an Amazonia may arise among our new States, and exhibit such a rule in the feminine gender. (*Frost* v. *Brisbin*, 19 *Wend.*, 15; *Brown* v. *Maryland*, 6 *Pet.*, *Cond.*, 562.) (2.) Under a construction and policy of this kind, the non-slaveholding States could pen up all slaveholders within their own States as effectually as the slave is himself confined by the rule applied in this case. This power cannot be conceded. (*per* GRIER, J., 7 *How.*, 461, 464.) 2. The section is not to be thus narrowed. The Constitution recognizes the legal character "citizen of the United States" as well as citizen of a particular State. (*Art.* 1, § 3, *subd.* 3; *art.* 2, § 1, *subd.* 5.) The latter term refers only to domicil; for every citizen of a particular State is a citizen of the United States. And the object of this section is to secure to the citizen, when within a State in which he is not domiciled, the general privileges and immunities which, in the very nature of

citizenship, as recognized and established by the Federal Constitution, belonged to that *status;* so that by no partial and adverse legislation of a State into which he might go as a stranger or a sojourner can he be deprived of them. It is a curb set upon State legislation harmonizing with the provision which extends the ægis of the federal judiciary to the non-resident citizen in all controversies between him and the citizens of the State in which he may be temporarily sojourning. (*Art.* 3, § 2; *per* CURTIS, J., 19 *How.*, 580.) 3. This section, like its brother in the judicial article, applies only to the stranger. The moment a citizen of Virginia, ceasing from his journey, sits down in the State of New York without the intent of leaving, or makes, in fact, any stay beyond the reasonable halt of a wayfarer, he becomes a citizen of New York, and relinquishes all benefit from these important guaranties of the Federal Constitution. 4. By the comity of civilized nations, the stranger is allowed to pass through a friendly territory without molestation. Even belligerents are allowed to pass their armies over a friendly neutral territory. (*Vattel, book* 3, *ch.* 7, §§ 119, 127; *Vattel, book* 2, *ch.* 8, §§ 108, 109, 110; *ch.* 10, §§ 132, 133, 134.) This comity, before existing between the States, was converted by the Constitution into an absolute right of the citizen. By the section quoted the citizen of each State is secured in all the general privileges and immunities of a citizen of the United States whilst temporarily and necessarily within a State other than that of his domicil. One of these is to be free from all burdens and taxation whatever; for, upon general principles, taxation is only imposed on residents or on dealings; another is to be free from local class legislation, for as a wayfarer he cannot be a member of any body of persons organized, governed or defined as a class under the State law The words "privileges and immunities" are here used essentially, though perhaps not exclusively, in a passive sense. The object is not to compel States to give strangers the same "rights" which they award to their own citizens; but to exempt the stranger from burdens, or obstructions of any kind. To stop his vessel or his carriage *in transitu* and carry off his ne-

gro servant—recognized as his property by the laws of his own State and the Federal Constitution—is a manifest invasion of his just "privileges and immunities." 5. Comity, as understood in speaking of the practice of friendly nations towards each other, which has been denominated international law, has no place in the relation between the States of this Union, except occasionally, in particular cases, to illustrate, by a somewhat remote analogy, the duty of a State toward the citizens of another State, or in giving due effect to rights arising under its laws. That duty is imposed, not by comity, as a rule of action, but by the Federal Constitution. (*Bowyer's Public Law*, 161, 162.) (1.) Comity, like municipal law, has its foundation in compact, express or implied. The social or international compact between the States, as such, was fixed by the Federal Constitution. (*Const. U. S., art.* 1, § 10.) (2.) A State might enact that all obligations arising from the relation of parent and child during the minority of the latter are abolished within this State, and any child hereafter "imported, introduced or brought into this State," shall thenceforth from all such obligations be free. A State might enact that the relation of husband and wife was fraught with mischievous consequences, and in fact a cover for gross tyranny and oppression; "that the said relation shall no longer exist within this State; and that any wife hereafter imported, introduced or brought into this State shall, thenceforth, from all obligations of that condition, be free." Young America might hurrah for the first law, and the class known as "strong minded women" might applaud the enactment of the latter. On that occasion, one of the latter class upon a rostrum proclaiming "liberty to all women" might well adopt the anti-slavery speech of Judge SWAN (6 *Ohio*, 671), giving it a new application, "The positive prohibition becomes an active, operating, ruling principle, and not a parenthesis. It *strikes down* and *destroys ! !*" What is there to protect this Union from the ruin and desolation of such laws except the guaranties of the Federal Constitution now relied upon? Unless they are enforced, in the form and to the extent which we demand, the unbridled sovereignty of our smallest

State, so long as our present Union lasts, will hold in its hand the power of dissolving our whole social system. Evil passions or some new fanaticism might at any moment set that power in motion.

VI. The general doctrines of the court in Dred Scott's case must be maintained, their alleged novelty notwithstanding. 1. That admiralty jurisdiction could exist without either tides or salt, was an idea too novel even for the great mind of Chief· Justice MARSHALL; but, at last, judicial wisdom, sharpened and impelled by strong necessity, cast aside these immaterial incidents and looking to the substance of the thing, found in the Constitution a government for our great rivers and inland seas. (*Genesee Chief* v. *Fitzhugh*, 12 *How. U. S. R.*, 443; Judge DANIEL's *Dissent*, 464.) 2. Whilst, in actual administration, some words used in our great political charters must thus be taken to comprehend more than was in the contemplation or intent of their framers; others, if we would preserve the Republic, must be carefully limited to the sphere covered by their mental vision at the time. (1.) If Utah should make its peculiar institution a religious duty, as Thugs regard murder, and should conduct its rites with all the decency and external purity of patriarchal times, Congress, within its sphere, and the several States, within theirs, might still legislate against it to any extent without violating constitutional restraints. Our Republic was founded by a civilization, with the existence of which this practice is incompatible. Self-preservation, if not a law of nature, is an invariable practice among men. If a State should fall into Thugism and respect the assassination of travelers as a religious ceremony, could not Congress and the federal judiciary, or the national executive by its military force repress the practice? (*Edinb. Rev. for July*, 1858, 120.) (2.) The "men" who made the Declaration of Independence in 1776; the "free inhabitants" spoken of in the Articles of Confederation (*art.* 4), in November, 1777, and the "inhabitants" and "male inhabitants" mentioned in the State Constitutions of that day (19 *How.*, 574), did not include all to whom these terms were lexicographically applicable. Indians living in

their tribes were not included (20 *Johns.*, 710, 734; 19 *How.*, 404.) The negroes were not included (19 *How.*; CURTIS, J., *Contra*, 19 *How.*, 582.) When at the close of our revolutionary struggle the same great family of States sat down to frame the laws for a more perfect and a perpetual union, the "citizens" whom they recognized as the supreme original source of all political power were the same class who acted together at the outset. If, in such rare instances and to such limited extent as to escape notice (18 *Pick.*, 209), negroes had been permitted in particular places, by an overstrained liberality in the interpretation of laws, or by ignorance of them, to glide noiselessly into a partial exercise of political power, an inference fatal to the Republic should not thence be drawn. *De minimis non curat lex.* (3.) The negro was forever excluded from social union by an indubitable law of nature; what folly it would have been to endow him with political equality. Indeed, ·it was impossible. It never has been done; it cannot be done. (4.) Whenever the judiciary of the Union shall declare in respect to the emancipated negroes of the North that they are "citizens" of the State in which they dwell, and therefore under the Constitution (*Art.* 4, § 2, *subd.* 1), ·"entitled in the several (other) States to all privileges and immunities of citizens," the law of nature, to which negro-philism so frequently appeals, will irresistibly demand the dissolution of our Union. We maintain that the negro was not permitted during the storm of battle to steal into a place in the fundamental institutions of our country, where, with full power to accomplish the fell purpose, he may lurk until the hour when it shall be his pleasure to apply the torch and explode our Republic forever.

VII. "It is highly fit that the court below should be corrected in the view which it has taken of this matter, since the doctrine laid down by it in this sentence is inconsistent with the peace of this country and the rights of other States." (*Per* Lord STOWELL, 1 *Dod.*, 99.)

*Joseph Blunt*, for The People, respondents.

I. The state of slavery is contrary to natural right, and is

not regarded with favor in any system of jurisprudence. All legal intendment is against it, and in favor of freedom. Slavery is the ownership of a man under the local laws of a State where slavery exists. It is not derived from any compact or consent of the slave. It originates in force, and its continuance is maintained by force. According to the law of slavery, the children of the slave become slaves. His labor and all the products of his labor belong to his master, and that labor may be coerced, at the discretion of the master, by stripes, or any other punishment short of death. Slavery requires a peculiar system of laws to enforce the rules of the master, which are irreconcilable with the jurisprudence of States where it does not exist.

The Roman law did not allow freedom to be sold. (*Edict. Theod.*, §§ 94, 95.) Slavery is *contra naturam*. (*Just. Inst., lib.* 1, *tit.* 3; *Aristotle Politic., lib.* 1, *ch.* 3.) Fortescue, in his discourse to Henry VI, on the laws of England, says: *Ab homine et pro vitio introducta est servitus. Sed libertas a Deo hominis est indita naturæ*. (*Cap.* 42.) The right to a slave is different from the right to other property. (*Vide Esclavage in Code de l'Humanite;* 18 *Pick.*, 216; 2 *McLean*, 596; 16 *Pet.*, 11; *Forbes* v. *Cochrane*, 2 *Barn. & Cress.*, 448.)

II. The law of slavery is local, and does not operate beyond the territory of the State where it is established. When the slave is carried, or escapes beyond its jurisdiction, he becomes free, and the State to which he resorts is under no obligation to restore him, except by virtue of express stipulation. (*Grotius, lib.* 2, *ch.* 15, 5, 1; *id., chap.* 10, 2, 1; *Wicquefort's Embassador, lib.* 1, *p.* 418; *Bodin de Rep., lib.* 1, *cap.* 5; 4 *Martin*, 385.) Case of the Creole and opinion in the House of Lords, 1842. (1 *Phillimore on International Law*, 316–345.)

In 1531, the Supreme Court at Mechlin rejected an application for surrendering a fugitive slave from Spain. (*Gudelin de Jure Noviss, lib.* 1, *ch.* 5.)

In 1738, Jean Borcaut, a slave from St. Domingo, was landed in France, and some formalities required by the edict of 1716 having been omitted, he was declared free. (15 *vol.*,

*Causes Célebres,* 3.) Before 1716, slaves from the colonies became free as soon as they landed in France. (*Id.*)

In 1758, Francisque, a negro slave from Hindostan, was brought into France, and although the formalities of the edicts of 1716 and 1738 had been complied with, he was declared free, because those edicts had not been extended to slaves from the East Indies. (*3d Denissart Decisions Nouvelles,* 406.)

In     , a Pole went into Russia, and sold himself into slavery; having been taken into Holland he claimed his freedom, and was declared free. (*Wiquefort's Ambassador et Ses Fonctions,* lib. 1, *p.* 418; *Phill. on International Law,* 342.)

Bodinus, in *De Republica,* cites two cases of the same character in France. One where a Spanish Ambassador brought a slave in his retinue, and in spite of all remonstrance he was declared free. The other, a Spanish merchant, touching at Toulon, on his way to Genoa by sea, with a slave on board, and the slave was declared free. (*Bodin. de Rep.,* lib. 1, 41.)

In 1762, *Stanley* v. *Harvey* (2 *Eden. Ch. Rep.,* 126), Lord NORTHINGTON held that a slave becomes free as soon as he lands in England. In the case of *Knight,* the negro, the Sessions Court, in Scotland, in 1770, held the same principle (*Fergusson's Rep. on Divorce, App.,* 396.) In the Somerset case, Lord MANSFIELD held, a negro who had been bought in Virginia and brought to England, to be free. (20 *Howell S. T.,* 82.) In 1824, the doctrine was applied to thirty-eight slaves who came on board of a British man-of-war off Florida, having escaped from a Florida plantation. Admiral Cockburn held them to be free, and the owner, Forbes, sued him in the King's Bench for their value. Judgment for defendant, on the ground that they became free by coming on board a British ship, it being neutral territory. (2 *Barn. & Cres.,* 448; 3 *Dowl. & Ryl.,* 697.)

In 1820, the Court of Appeals in Kentucky held, that where a slave born in Kentucky had been taken into Indiana under territorial laws, allowing the introduction of slaves without their becoming free, and afterwards was brought back to Kentucky, she became free.

The court said, that "in deciding this question, we disclaim the influence of the general principles of liberty which we all admire, and conceive it ought to be decided by the law as it is, and not as it ought to be. Slavery is sanctioned by the laws of this State, and the right to hold them under our municipal regulations, is unquestionable. But we view this as a right existing by positive law of a municipal character, without foundation in the law of nature, or the unwritten and common aw." (*Rankin* v. *Lydia*, 2 *A. K. Marsh. R.*, 470.) Again, "it is the right of another to the labor of a slave, whether exercised or not, which constitutes slavery, or involuntary servitude. The right, then, during the seven years' residence of Lydia in Indiana, was not only suspended, but ceased to exist; *and we are not aware of any law of this State which can or does bring into operation the right of slavery when once destroyed.* It would be a construction without language to be construed— implication without any scrap of law, written or unwritten, statutory or common, from which the inference could be drawn —to revive the right to a slave, when that right had passed over to the slave himself, and he had become free." (*Id.*, 472.)

In 1805, the Court of Appeals of Virginia held, that a Virginia slave, taken by its owner into Maryland, and kept there more than a year, became free upon being brought back to. Virginia—that State having prohibited the importation of slaves. (*Wilson* v. *Isbell*, 5 *Call's R.*, 430; *Hunter* v. *Fulcher*, 1 *Leigh.*, 172.)

In 1813, a slave, occasionally taken by his owner from Maryland, to work his quarry in Virginia, in all twelve months, was held to have become free—the law of Virginia having prohibited the importation of slaves. (*Stewart* v. *Oakes*, 5 *Farr & Johns.*, 107.)

In 1824, the Supreme Court of Louisiana held, that a slave taken from Kentucky into Ohio to reside, became free; and that having become free, removal into a slave State with her master did not make her a slave again. (14 *Martin's R.*, 401.) In 1835 it held that a slave taken into France, and afterwards

brought back to Louisiana, became free. (*Marie Louise* v. *Marot,* 8 *Louis. R.,* 475.) In 1816 the same court held that a person claimed as a slave by a bill of sale executed in a free State or territory, must be deemed free, unless the right of conveying him out of that State could be justified, by proving him to be a fugitive slave. (*Forsyth* v. *Nash,* 4 *Martin,* 390.) Before the act of 1846, the courts of Louisiana always held that a slave taken into a free State became free; and that he did not become a slave upon being brought back. (*Eugenie* v. *Preval,* 2 *Louis. Annual R.,* 180; *Smith* v. *Smith,* 13 *Louis. R.,* 444; *Virginia* v. *Himel,* 10 *Louis. Ann. R.,* 185; *Josephine* v. *Poultney,* 1 *id.,* 328; 14 *Martin Louis. R.,* 401.)

The Supreme Court of Missouri held, that the actual residence of a slave in Illinois is sufficient evidence of freedom. (*Milly* v. *Smith,* 2 *Mo. Rep.,* 36, in 1829.) Also, that a slave taken into Illinois on his route to Missouri, but hired by a resident while there, became free. (*Julia* v. *McKinney,* 3 *id.,* 270, in 1833.) The same, where the slave on his journey was detained four weeks in Illinois. (*Wilson* v. *Melvin,* 4 *id.,* 592, in 1837.) And where an army officer took his slave to his post in the northwestern territory, the slave was held free. (*Rachel* v. *Walker,* 4 *id.,* 350, in 1836.)

In 1851, the Court of Appeals in South Carolina, in an action for the value of a slave, recognized the principle that a slave landing in a free State became free. (*Ellis* v. *Welch,* 4 *Rich.,* 468.)

In 1840, the General Court of Virginia held that a slave taken by her master into Massachusetts and brought back into Virginia, was entitled to her freedom. (*Commonwealth* v. *Pleasant,* 10 *Leigh.,* 697; *Betty* v. *Horton,* 5 *id.,* 615.) In this case the court held that this freedom was acquired by the action of the law of Massachusetts upon the slaves coming there.

In 1833, Chief Justice SHAW held that a slave temporarily brought by his owner into Massachusetts, became free. (*Commonwealth* v. *Aves,* 18 *Pick. R.,* 193.)

III. The provision in the Federal Constitution relating to fugitive slaves, recognizes this principle of universal jurispru-

dence, and imposes on the free States an obligation which is limited to fugitive slaves. If slaves were recognized as property under the Constitution, this provision would be unneces sary. When this provision was under discussion it was amended by striking out the word "legally" before "held to service;" because some thought slavery could not be legal in a moral point of view, and substituting " under the laws there-of." (*Journal of Federal Constitution,* 1787, *pages* 306, 365, 384.) It was then deemed improper to admit in the Constitution the idea that there could be property in men. (*Madison's Works,* 1429.) C. C. Pinckney, in speaking of this provision, says: " We have obtained a right to recover our slaves, in whatever part of America they may take refuge—which is a right we had not before." (16 *Peters,* 648.)

IV. The persons here claimed as slaves, are free by the express enactment of the Legislature of this State. (1 *R. S.,* 656, *part* 1, *tit.* 7, § 1.) " No person held as a slave shall be imported, introduced, or brought into this State, *on any pretence whatever.* Every such person shall be free." " Every person brought into this State as a slave shall be free." The exception originally made in favor of persons *in transitu* with their slaves, was repealed in 1841. (*Ch.* 247.)

The right to declare and control the condition of its citizens is a right belonging to the States, and has not been conferred on the Federal Government. Otherwise the whole power over slavery must be deemed within the control of Congress.

V. They cannot be held by virtue of any provision of the Constitution of the United States. The provisions cited on the argument before Mr. Justice PAINE are: That relating to fugitives from justice. (*Art.* 4, § 2.) That full faith and credit shall be given in each State to each State, to the public acts of every other State. (*Art.* 4, § 1.) That the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States. (*Art.* 4, § 2.) That no citizen shall be deprived of life, liberty, or property, without due process of law. (*Art.* 5 *of Amendments.*) None of these provisions have any reference to this case. They are not fugitives escap-

ing into this State from another State. We give full faith and credit to the act of Virginia, that made these persons slaves there. We allow the appellant all the privileges and immuni.ies of a citizen of this State. He has not been deprived of property by these proceedings. The appellant had no property in these persons. It ceased to be property when he brought them into the State of New York.

The Constitution of the United States is a grant of powers to the General Government. It follows, by necessary consequence, that what is not granted is reserved. If there is no grant of power to enforce upon New York the obligation to allow a citizen of a slave State to bring his slaves here and retain them here as slaves, while sojourning or passing through this State, the General Government has not the power; and the right to do so does not exist. New York having prohibited the act, no jurisdiction can declare her law unconstitutional. She has the right to reiterate the law of nature—to purge her soil of an evil that exists only in violation of natural right—to maintain, in practice as well as theory, the sacred rights of persons and personal liberty. Even in consenting to the reclamation of fugitives from service, she does not acknowledge the law of slavery. She agrees to ignore that question; and not to inquire into the nature of the duty of service on the part of the fugitive, whether a slave or an apprentice; but to remit him to the courts of the State from which he fled. But this is the extent of her duty, her bond extends no further than to the fugitive. As to all other persons, her laws protect their personal liberty against all claimants.

It was not contemplated, at the formation of the Constitution, that slavery was to be a permanent institution of the United States. It is inconsistent with the principle that lies at the foundation of our government. It is in contradiction to the Declaration of Independence, and to the preamble to the Constitution. All the provisions of that instrument and contemporaneous history look to its ultimate extinction by the legislation and action of the State governments. (*Emancipation acts of Vermont in* 1777; *New Hampshire*, 1783; *Rhode*

*Island,* 1784; *Connecticut,* 1784; *New York,* 1799; *New Jersey,* 1804; *and Pennsylvania,* 1780; *Bill of Rights of Massachusetts; and decision in James* v. *Lechmere, in* 1770, that slavery was illegal in that State; 2*d vol. Franklin's Works,* 517; *Madison's Works,* 1429; *Jefferson's Notes,* 152; *Washington's Will,* 1 *vol.,* 569; *Helper's Crisis,* 193–224.)

In incorporating the fugitive slave provision into the Constitution, the Convention was careful not to do anything which should imply their sanction of slavery as legal. The provision reported by the committee, September 12, 1787, read, "legally held to service;" and it was amended September 15, by striking out "legally," so as to read "held to service under the laws thereof." (*Journal,* 384, *and Madison, pp.* 1558 *and* 1589.) The word "service" was substituted for "servitude," on motion of Edmund Randolph; the latter being descriptive of slaves, and the former of free persons. (3 *Mad.,* 1569.)

VI. These persons are not to be held as slaves, under any implied covenants between the States of the Union, nor by any rule of comity.

1. There is no implied obligation on the part of New York, to allow a slave within her borders, in any form or under any circumstances. The provision relating to the surrender of fugitives from service, is the only possible case where such an obligation can arise. And by incorporating this provision in the Constitution, every other case is excluded. *Expressio unius, exclusio alterius.* If the general right existed, and it was admitted that a slave of a slave State might still be held if escaping into or taken into a free State *in transitu,* the constitutional provision as to fugitives would be superfluous.

2. No comity of States requires us to admit slavery into our State in any form. In extending comity towards the laws of other States, it is the State and not the Court that establishes the rule. (Chief Justice TANEY, in *Augusta* v. *Earle,* 13 *Pet.,* 589; *Grotius, L.* ii, *ch.* xxii, § 16.)

There can be no such comity here, because the State has made an express statute declaring these persons to be free. Comity is not an obligation to be enforced by a superior, but

a courtesy allowed by the party assuming the duty. In deci·
ding whether comity requires any act, we look to our own
laws and adjudication for authority. And it can never be
exercised in violation of our laws. (*Story, Conflict of Laws,* §§
23, 24, 36, 37; *Willard* v. *The People,* 4 *Scam.,* 461; *Common-
wealth* v. *Aves,* 18 *Pick. R.,* 221; 3 *Am. Jurist,* 404.)

No comity requires us to allow an act here, by citizens of
another State, that if done by our own citizens would be a
felony.

The comity of nations is based upon principles that destroy
all right to hold these persons as slaves. The laws of moral
right, the recognition of personal liberty by the law of nations
forbid it. A state prisoner, escaping from Austria or Italy (a
slave to the law), cannot be reclaimed. A serf from Russia,
or a Barbary slave, brought hither by his master, *in transitu,*
could not be here restrained from liberty by any law or comity.
To discover (says Vattel, in his Preliminary Discourse) the
rights and duties of nations, we must investigate the natural
rights and duties of individuals. The laws of nations are, in
their origin, only natural rights of men applied to nations.
(§ 6, *Montes. Spirit of Laws,* b. 15, *ch.* v, § 5.) If the sanctity
of personal liberty was as much regarded in practice as it is in
the theories of government, and law and morals—if courts
and legislatures declared in this particular case the admitted
general law, a cogent argument may be drawn in favor of the
liberty of these persons, from the maxims and principles of
the laws of nations, as developed by the highest authority.
Says Vattel (*Le Droit des Gens., lib.* 3, *ch.* 8, § 152), after
remarking briefly upon the question, whether or not prisoners
of war can be enslaved, "This topic has been enough dis·
cussed. I shall not pursue it. Fortunately this disgrace to
humanity has been banished from Europe." (*Grot., L.* ii, *ch.*
x, § 1.)

VII. These persons cannot be restrained of their liberty,
whatever may have been their state in Virginia. If restrained
of liberty here, it must be either under and by virtue of
our laws, or under the laws of Virginia. The allegation of

the writ is, that they were held and confined in a certain house in this city, against their will. The answer is, they are slaves. Our laws prohibit any such holding. They furnish no remedy if the person claimed refuse to be detained. The question here is, can they be detained? Certainly not by our laws; and our courts can only administer our own laws. The laws of Virginia are not in force here. If the slave resists, how can he be compelled to subjection? If the master has not the power to enforce obedience, he cannot invoke the aid of law, for no law exists for such a case. It follows, that our laws, in this respect, if they remain neutral, leave the parties to their natural rights. This being so, the slave is free.

VIII. They are free by the common law. (*Co. Litt.*, 124, *b; Somerset's Case*, 20 *Howell's State Trial*, 79; *Knight* v. *Wedderburn, id., p.* 2; *Forbes* v. *Cochrane*, 2 *Barn. & Cress.*, 448; *Greenwood* v. *Curtis*, 6 *Mass. R.*, 366; *Case of the Antelope*, 10 *Wheat.*, 420; *Jones* v. *Van Zandt*, 2 *McLean*, 596.)

*William M. Evarts*, for the respondents.

I. The writ of *habeas corpus* belongs of right to every person restrained of liberty within this State, under any pretence whatsoever, unless by certain judicial process of Federal or State authority. (2 *R. S.*, 563, § 21.) This right is absolute (1) against legislative invasion, and (2) against judicial discretion. (*Const. art.* 1, § 4; 1 *R. S.*, 565, § 31.)

In behalf of a human being, restrained of liberty within this State, the writ, by a legal necessity, must issue. The office of the writ is to enlarge the person in whose behalf it issues, unless legal cause be shown for the restraint of liberty or its continuation; and enlargement of liberty, unless such cause to the contrary be shown, flows from the writ by the same legal necessity that required the writ to be issued. (2 *R. S.*, 567, § 39.)

II. The whole question of the case, then, is, does the relation of slave owner and slave, which subsisted in Virginia between Mrs. Lemmon and these persons while there, attend

upon them while commorant within this State, in the course of travel from Virginia to Texas, so as to furnish "legal cause" for the restraint of liberty complained of, and so as to compel the authority and power of this State to sanction and maintain such restraint of liberty.

1. Legal cause of restraint can be none other than an authority to maintain the restraint which has the force of law within this State. Nothing has or can claim the authority of law within this State, unless it proceeds—

(A.) From the sovereignty of the State, and is found in the Constitution or Statutes of the State, or in its unwritten common (or customary) law; or—

(B.) From the Federal Government, whose Constitution and Statutes have the force of law within this State. So far as the law of nations has force within this State, and so far as, "by comity," the laws of other sovereignties have force within this State, they derive their efficacy, not from their own vigor, but by administration as a part of the law of this State. (*Story Confl. Laws*, §§ 18, 20, 23, 25, 29, 33, 35, 37, 38; *Bank of Augusta* v. *Earle*, 13 *Pet.*, 519, 589; *Dalrymple* v. *Dalrymple*, 2 *Hagg. Consist. R.*, 59; *Dred Scott* v. *Sandford*, 19 *How.*, 460, 461, 486, 487.)

2. The Constitution of the United States and the federal statutes give no law on the subject. The Federal Constitution and legislation under it have, in principle and theory, no concern with the domestic institutions, the social basis, the social relations, the civil conditions, which obtain within the several States. The actual exceptions are special and limited, and prove the rule. They are—

(A.) A reference to the civil conditions obtaining within the States to furnish an artificial enumeration of persons as the basis of federal representation and direct taxation distributively between the States.

(B.) A reference to the political rights of suffrage within the States as, respectively, supplying the basis of the federal suffrage therein.

(C.) A provision securing to the citizens of every State

within every other the privileges and immunities (whatever they may be) accorded in each to its own citizens.

(D.) A provision preventing the laws or regulations of any State governing the civil condition of persons within it, from operating upon the condition of persons "held to service or labor in one State, under the laws thereof, escaping into another." (*Const. U. S.,* art. 1, § 2, *subd.* 1 *and* 3; *art.* 4, § 2, *subd.* 1 *and* 3; *Laws of Slave States and of Free States on Slavery; Ex parte Simmons,* 4 *Wash. C. C. R.,* 396; *Jones* v. *Van Zandt,* 2 *McLean,* 597; *Groves* v. *Slaughter,* 15 *Peters,* 506, 508–510; *Prigg* v. *Pennsylvania,* 16 *Pet.,* 611, 612, 622, 623, 625; *Strader* v. *Graham,* 10 *How.,* 82, 93; *New York* v. *Miln,* 11 *Pet.,* 136; *Dred Scott* v. *Sandford; Ch. J.,* 452; NELSON, J., 459, 461; CAMPBELL, J., 508, 509, 516, 517.)

None of these provisions, in terms or by any intendment, support the right of the slave owner in his own State or in any other State, except the last. This, by its terms, is limited to its special case, and necessarily excludes federal intervention in every other.

3. The common law of this State permits the existence of slavery in no case within its limits. (*Const.,* art. 1, § 17; *Sommersett's case,* 20 *How. St. Trials,* 79; *Knight* v. *Wedderburn, id.,* 2; *Forbes* v. *Cochrane,* 2 *Barn. & Cress.,* 448; *Shanley* v. *Harvey,* 2 *Eden,* 126; *The Slave Grace,* 2 *Hagg. Adm.,* 118, 104; *Story Confl. Laws,* § 96; *Co. Litt.,* 124 *b.*)

4. The statute law of this State effects a universal proscription and prohibition of the condition of slavery within the limits of the State. (1 *R. S.,* 656, § 1; *id.,* 659, § 16; 2 *R. S.,* 664, § 28; *Dred Scott* v. *Sandford,* 19 *How.,* 591, 595; *Laws of* 1857, 797.)

III. It remains only to be considered whether, under the principles of the law of nations, as governing the intercourse of friendly States, and as adopted and incorporated into the administration of our municipal law, comity requires the recognition and support of the relation of slave owner and slave between strangers passing through our territory, notwithstanding the absolute policy and comprehensive legisla-

tion which prohibit that relation and render the civil condition of slavery impossible in our own society.

The comity, it is to be observed, under inquiry, is (1) of the State and not of the Court, which latter has no authority to exercise comity in behalf of the State, but only a judicial power of determining whether the main policy and actual legislation of the State exhibit the comity inquired of; and (2) whether the comity extends to yielding the affirmative aid of the State to maintain the mastery of the slave owner and the subjection of the slave. (*Story Confl. Laws*, § 38; *Bank of Augusta* v. *Earle*, 13 *Pet.*, 589; *Dred Scott* v. *Sandford*, 19 *How.*, 591.)

1. The principles, policy, sentiments, public reason and conscience, and authoritative will of the State sovereignty, as such, have been expressed in the most authentic form, and with the most distinct meaning, that slavery, whencesoever it comes, and by whatsoever casual access, or for whatsoever transient stay, shall not be tolerated upon our soil.

That the particular case of slavery during transit has not escaped the intent or effect of the legislation on the subject, appears in the express permission once accorded to it, and the subsequent abrogation of such permission. (1 *R. S.*, *part* 1, *ch.* 20, *tit.* 7, §§ 6, 7; *Repealing act, Laws* 1841, *ch.* 247.) Upon such a declaration of the principles and sentiments of the State, through its Legislature, there is no opportunity or scope for judicial doubt or determination. (*Story Confl. Laws*, §§ 36, 37, 23, 24; *Vattel*, 1, §§ 1, 2.)

2. But, were such manifest enactment of the sovereign will in the premises wanting, as matter of general reason and universal authority, the *status* of slavery is never upheld in the case of strangers, resident or in transit, when the domestic laws reject and suppress such *status* as a civil condition or social relation.

(A.) The same reasons of justice and policy which forbid the sanction of law and the aid of public force to the proscribed *status* among our own population, forbid them in the case of strangers within our territory.

(B.) The *status* of slavery is not a natural relation, but con-trary to nature, and at every moment it subsists, it is an ever new and active violation of the law of nature. (*Const. Va.*, *Bill of Rights*, §§ 1, 14, 15; *Taylor's Elements of Civil Law*, 429; 2 *Dev.*, 263; 9 *Geo.*, 580; *Henning's Statutes at Large*, *vol.* 10, 129; *id.*, 11, 322, 324.)

It originates in mere predominance of physical force, and is continued by mere predominance of social force or municipal law.

Whenever and wherever the physical force in the one stage, or the social force or municipal law in the other stage, fails, the *status* falls, for it has nothing to rest upon.

To continue and defend the *status*, then, within our territory, the stranger must appeal to some municipal law. He has brought with him no system of municipal law to be a weapon and a shield to this *status;* he finds no such system here. His appeal to force against nature, to law against justice, is vain, and his captive is free.

(C.) The law of nations, built upon the law of nature, has adopted this same view of the *status* of slavery, as resting on force against right, and finding no support outside of the jurisdiction of the municipal law which establishes it.

(D.) A State proscribing the *status* of slavery in its domestic system, has no apparatus, either of law or of force, to main-tain the relation between strangers.

It has no code of the slave owner's rights or of the slave's submission, no processes for the enforcement of either, no rules of evidence or adjudication in the premises, no guard-houses, prisons or whipping-posts to uphold the slave owner's power and crush the slave's resistance.

But a comity which should recognize a *status* that can subsist only by force, and yet refuse the force to sustain it, is illusory. If we recognize the fragment of slavery imported by a stranger, we must adopt the fabric of which it is a fragment and from which it derives its vitality.

If the slave be eloigned by fraud or force, the owner must have replevin for him or trover for his value.

If a creditor obtain a foreign attachment against the slave owner, the sheriff must seize and sell the slaves.

If the owner die, the surrogate must administer the slave as assets.

If the slave give birth to offspring, we have a native-born slave.

If the owner, enforcing obedience to his caprices, maim or slay his slave, we must admit the *status* as a plea in bar to the public justice.

If the slave be tried for crime, upon his owner's complaint, the testimony of his fellow slaves must be excluded.

If the slave be imprisoned or executed for crime, the value taken by the State must be made good to the owner, as for "private property taken for public use."

Everything or nothing, is the demand from our comity; everything or nothing, must be our answer.

(E.) The rule of the law of nations which permits the transit of strangers and their property through a friendly State does not require our laws to uphold the relation of slave owner and slave between strangers.

By the law of nations, men are not the subject of property.

By the law of nations, the municipal law which makes men the subject of property, is limited with the power to enforce itself, that is by its territorial jurisdiction.

By the law of nations, then, the strangers stand upon our soil in their natural relations as men, their artificial relation being absolutely terminated. (*The Antelope*, 10 *Wheat.*, 120, 121, *and cases ut supra.*)

(F.) The principle of the law of nations which attributes to the law of the domicil the power to fix the civil *status* of persons, does not require our laws to uphold, within our own territory, the relation of slave owner and slave between strangers.

This principle only requires us (1) to recognise the consequences, in reference to subjects within our own jurisdiction (so far as may be done without prejudice to domestic interests), of the *status* existing abroad; and (2) where the *status* itself is brought within our limits and is here permissible as a domestic

*status*, to recognize the foreign law as an authentic origin and support of the actual *status*.

It is thus that marriage contracted in a foreign domicil, according to the municipal law there, will be maintained as a continuing marriage here, with such traits as belong to that relation here; yet, incestuous marriage or polygamy, lawful in the foreign domicil, cannot be held as a lawful continuing relation here. (*Story Confl. Laws*, §§ 51, 51 a., 89, 113, 114, 96, 104, 620, 624.)

(G.) This free and sovereign State, in determining to which of two external laws it will by comity add the vigor of its adoption and administration within its territory, viz., a foreign municipal law of force against right, or the law of nations conformed to its own domestic policy under the same impulse which has purged its own system of the odious and violent injustice of slavery, will prefer the law of nations to the law of Virginia, and set the slave free.

*Impius et crudelis judicandus est, qui libertati non favet. Nostra jura* IN OMNI CASU *libertati dant favorem.* (*Co. Litt., ut supra.*)

DENIO, J.   The petition upon which the writ of *habeas corpus* was issued, states that the colored persons sought to be discharged from imprisonment were, on the preceding night, taken from the steamer City of Richmond, in the harbor of New York, and at the time of presenting the petition, were confined in a certain house in Carlisle street in that city.   The writ is directed to the appellant by the name of "Lemmings," as the person having in charge "eight colored persons lately taken from the steamer City of Richmond, and to the man in whose house in Carlisle street they were confined."   The return is made by Lemmon, the appellant, and it speaks of the colored persons who are therein alleged to be slaves, and the property of Juliet Lemmon, as "the eight slaves or persons named in the said writ of *habeas corpus.*"   It alleges that they were taken out of the possession of Mrs. Lemmon, while *in transitu* between Norfolk, in Virginia, and the State of Texas, and that both Virginia and Texas are slaveholding States; that

she had no intention of bringing the slaves into this State to remain therein, or in any manner except on their transit as aforesaid through the port of New York; that she was compelled by necessity to touch or land, but did not intend to remain longer than necessary, and that such landing was for the purpose of passage and transit and not otherwise, and that she did not intend to sell the slaves. It is also stated that she was compelled by "necessity or accident" to take passage from Norfolk in the above mentioned steamship, and that Texas was her ultimate place of destination.

I understand the effect of these statements to be that Mrs. Lemmon, being the owner of these slaves, desired to take them from her residence in Norfolk to the State of Texas; and, as a means of effecting that purpose, she embarked, in the steamship mentioned, for New York, with a view to secure a passage from thence to her place of destination. As nothing is said of any stress of weather, and no marine casualty is mentioned, the' necessity of landing, which is spoken of, refers, no doubt, to the exigency of that mode of prosecuting her journey. If the ship in which she arrived was not bound for the Gulf of Mexico, she would be under the necessity of landing at New York to reëmbark in some other vessel sailing for that part of the United States; and this, I suppose, is what it was intended to state. The necessity or accident which is mentioned as having compelled her to embark at Norfolk in the City of Richmond, is understood to refer to some circumstance which prevented her making a direct voyage from Virginia to Texas. The question to be decided is whether the bringing the slaves into this State under these circumstances entitled them to their freedom.

The intention, and the effect, of the statutes of this State bearing upon the point are very plain and unequivocal. By an act passed in 1817, it was declared that no person held as a slave should be imported, introduced or brought into this State on any pretence whatever, except in the cases afterwards mentioned in the act, and any slave brought here contrary to the act was declared to be free. Among the excepted cases

was that of a person, not an inhabitant of the State, passing through it, who was allowed to bring his slaves with him; but they were not to remain in the State longer than nine months. (*Laws of* 1817, *ch*. 137, §§ 9, 15.) The portions of this act which concern the present question were reënacted at the revision of the laws in 1830. The first and last sections of the title are in the following language:

"§ 1. No person held as a slave shall be imported, introduced or brought into this State on any pretence whatsoever, except in the cases hereinafter specified. Every such person shall be free. Every person held as a slave who hath been introduced or brought in this State contrary to the laws in force at the time, shall be free."

"§ 16. Every person born in this State, whether white or colored, is free. Every person who shall hereafter be born within this State shall be free; and every person brought into this State as a slave, except as authorized by this title, shall be free." (*R. S., part* 1, *ch* 20, *tit.* 7.)

The intermediate sections, three to seven inclusive, contain the exceptions. Section 6 is as follows: "Any person, not being an inhabitant of this State, who shall be traveling to or from, or passing through this State, may bring with him any person lawfully held in slavery, and may take such person with him from this State; but the person so held in slavery shall not reside or continue in this State more than nine months; if such residence be continued beyond that time such person shall be free." In the year 1841, the Legislature repealed this section, together with the four containing other exceptions to the general provisions above mentioned. (*Ch*. 247.) The effect of this repeal was to render the 1st and 16th sections absolute and unqualified. If any doubt of this could be entertained upon the perusal of the part of the title left unrepealed, the rules of construction would oblige us to look at the repealed portions in order to ascertain the sense of the residue. (*Bussey* v. *Story*, 4 *Barn. & Adolph.*, 98.) Thus examined, the meaning of the statute is as plain as though the Legislature had declared in terms that if any person should introduce a slave into this State, in

the course of a journey to or from it, or in passing through it, the slave shall be free.

If, therefore, the Legislature had the constitutional power to enact this statute, the law of the State precisely meets the case of the persons who were brought before the judge on the writ of *habeas corpus*, and his order discharging them from constraint was unquestionably correct. Every sovereign State has a right to determine by its laws the condition of all persons who may at any time be within its jurisdiction; to exclude therefrom those whose introduction would contravene its policy, or to declare the conditions upon which they may be received, and what subordination or restraint may lawfully be allowed by one class or description of persons over another. Each State has, moreover, the right to enact such rules as it may see fit respecting the title to property, and to declare what subjects shall, within the State, possess the attributes of property, and what shall be incapable of a proprietary right. These powers may of course be variously limited or modified by its own constitutional or fundamental laws; but independently of such restraints (and none are alleged to exist affecting this case) the legislative authority of the State over these subjects is without limit or control, except so far as the State has voluntarily abridged her jurisdiction by arrangements with other States. There are, it is true, many cases where the conditions impressed upon persons and property by the laws of other friendly States may and ought to be recognized within our own jurisdiction. These are defined, in the absence of express legislation, by the general assent and by the practice and usage of civilized countries, and being considered as incorporated into the municipal law, are freely administered by the courts. They are not, however, thus allowed on account of any supposed power residing in another State to enact laws which should be binding on our tribunals, but from the presumed assent of the law-making power to abide by the usages of other civilized States. Hence it follows that where the Legislature of the State, in which a right or privilege is claimed on the ground of comity, has by its laws spoken upon the subject of the alleged right, the tribu-

nals are not at liberty to search for the rule of decision among the doctrines of international comity, but are bound to adopt the directions laid down by the political government of their own State. We have not, therefore, considered it necessary to inquire whether by the law of nations, a country where negro slavery is established has generally a right to claim of a neighboring State, in which it is not allowed, the right to have that species of property recognized and protected in the course of a lawful journey taken by the owner through the last mentioned country, as would undoubtedly be the case with a subject recognized as property everywhere; and it is proper to say that the counsel for the appellant has not urged that principle in support of the claim of Mrs. Lemmon.

What has been said as to the right of a sovereign State to determine the *status* of persons within its jurisdiction applies to the States of this Union, except as it has been modified or restrained by the Constitution of the United States (*Groves* v. *Slaughter*, 15 *Pet.*, 419; *Moore* v. *The People of Illinois*, 14 *How.*, 13; *City of New York* v. *Miln*, 11 *Pet.*, 131, 139.) There are undoubtedly reasons, independently of the provisions of the Federal Constitution, for conciliatory legislation on the part of the several States, towards the polity, institutions and interests of each other, of a much more persuasive character than those which prevail even between the most friendly States unconnected by any political union; but these are addressed exclusively to the political power of the respective States; so that whatever opinion we might entertain as to the reasonableness, or policy, or even of the moral obligation of the non-slaveholding States to establish provisions similar to those which have been stricken out of the Revised Statutes, it is not in our power, while administering the laws of this State in one of its tribunals of justice, to act at all upon those sentiments, when we see, as we cannot fail to do, that the Legislature has deliberately repudiated them.

The power which has been mentioned as residing in the States is assumed by the Constitution itself to extend to persons held as slaves by such of the States as allow the condition

of slavery, and to apply also to a slave in the territory of another State, which did not allow slavery, even unaccompanied with an intention on the part of the owner to hold him in a state of slavery in such other State. The provision respecting the return of fugitives from service contains a very strong implication to that effect. It declares that no person held to service or labor in one State, under the laws thereof, escaping into another, shall in consequence of any law or regulation therein, be discharged from such service or labor, &c. There was at least one State which at the adoption of the Constitution did not tolerate slavery; and in several of the other States the number of slaves was so small and the prevailing sentiment in favor of emancipation so strong, that it was morally certain that slavery would be speedily abolished. It was assumed by the authors of the Constitution, that the fact of a Federative Union would not of itself create a duty on the part of the States which should abolish slavery to respect the rights of the owners of slaves escaping thence from the States where it continued to exist. The apprehension was not that any of the States would establish rules or regulations looking primarily to the emancipation of fugitives from labor, but that the abolition of slavery in any State would draw after it the principle that a person held in slavery would immediately become free on arriving, in any manner, within the limits of such State. That principle had then recently been acted upon in England in a case of great notoriety, which could not fail to be well known to the cultivated and intelligent men who were the principal actors in framing the Federal Constitution. A Virginia gentleman of the name of Stewart had occasion to make a voyage from his home in that Colony to England, on his own affairs, with the intention of returning as soon as they were transacted; and he took with him as his personal servant his negro slave, Somerset, whom he had purchased in Virginia and was entitled to hold in a state of slavery by the laws prevailing there. While they were in London, the negro absconded from the service of his master, but was re-taken and put on board a vessel lying in the Thames bound to Jamaica, where slavery also prevailed, for

the purpose of being there sold as a slave. On application to Lord MANSFIELD, Chief Justice of the King's Bench, a writ of *habeas corpus* was issued to Knowles as master of the vessel, whose return to the writ disclosed the foregoing facts. Lord MANSFIELD referred the case to the decision of the Court of King's Bench, where it was held, by the unanimous opinion of the judges, that the restraint was illegal, and the negro was discharged. (*The Negro Case*, 11 *Harg. S. T.*, 340; *Somerset* v. *Stewart, Lofft*, 1.) It was the opinion of the court that a state of slavery could not exist except by force of positive law, and it being considered that there was no law to uphold it in England, the principles of the law respecting the writ of *habeas corpus* immediately applied themselves to the case, and it became impossible to continue the imprisonment of the negro. The case was decided in 1772, and from that time it became a maxim that slaves could not exist in England. The idea was reiterated in the popular literature of the language, and fixed in the public mind by a striking metaphor which attributed to the atmosphere of the British Islands a quality which caused the shackles of the slave to fall off. The laws of England respecting personal rights were in general the laws of the Colonies, and they continued the same system after the Revolution by provisions in their Constitutions, adopting the common law subject to alterations by their own statutes. The literature of the Colonies was that of the mother country.

The aspect in which the case of fugitive slaves was presented to the authors of the Constitution therefore was this: A number of the States had very little interest in continuing the institution of slavery, and were likely soon to abolish it within their limits. When they should do so, the principle of the laws of England as to personal rights and the remedies for illegal imprisonment, would immediately prevail in such States. The judgment in Somerset's case and the principles announced by Lord MANSFIELD, were standing admonitions that even a temporary restraint of personal liberty by virtue of a title derived under the laws of slavery, could not be sustained where that institution did not exist by positive law, and where

the remedy by *habeas corpus*, which was a cherished institution of this country as well as in England, was established. Reading the provision for the rendition of fugitive slaves, in the light which these considerations afford, it is impossible not to perceive that the Convention assumed the general principle to be that the escape of a slave from a State in which he was lawfully held to service into one which had abolished slavery would *ipso facto* transform him into a free man. This was recognized as the legal consequence of a slave going into a State where slavery did not exist, even though it were without the consent and against the will of the owner. *A fortiori* he would be free if the master voluntarily brought him into a free State for any purpose of his own. But the provision in the Constitution extended no further than the case of fugitives. As to such cases, the admitted general consequence of the presence of a slave in a free State was not to prevail, but he was by an express provision in the federal compact to be returned to the party to whom the service was due. Other cases were left to be governed by the general laws applicable to them. This was not unreasonable, as the owner was free to determine whether he would voluntarily permit his slave to go within a jurisdiction which did not allow him to be held in bondage. That was within his own power, but he could not always prevent his slaves from escaping out of the State in which their servile condition was recognized. The provision was precisely suited to the exigency of the case, and it went no further.

In examining other arrangements of the Constitution, apparently inserted for purposes having no reference to slavery, we ought to bear in mind that when passing the fugitive slave provision the Convention was contemplating the future existence of States which should have abolished slavery, in a political union with other States where the institution would still remain in force. It would naturally be supposed that if there were other cases in which the rights of slave owners ought to be protected in the States which should abolish slavery, they would be adjusted in connection with the pro-

vision looking specially to that case, instead of being left to be deduced by construction from clauses intended primarily for cases to which slavery had no necessary relation. It has been decided that the fugitive clause does not extend beyond the case of the actual escape of a slave from one State to another. (*Ex parte Simmons,* 4 *Wash. C. C. R.*, 396.) But the provision is plainly so limited by its own language.

The Constitution declares that the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States. (*Art.* 4, § 2.) No provision in that instrument has so strongly tended to constitute the citizens of the United States one people as this. Its influence in that direction cannot be fully estimated without a consideration of what would have been the condition of the people if it or some similar provision had not been inserted. Prior to the adoption of the Articles of Confederation, the British colonies on this continent had no political connection, except that they were severally dependencies of the British crown. Their relation to each other was the same which they respectively bore to the other English colonies, whether on this continent or in Europe or Asia. When, in consequence of the Revolution, they severally became independent and sovereign States, the citizens of each State would have been under all the disabilities of alienage in every other, but for a provision in the compacts into which they entered whereby that consequence was avoided. The articles adopted during the Revolution formed essentially a league for mutual protection against external force; but in passing them it was felt to be necessary to secure a community of intercourse which would not necessarily obtain even among closely allied States. This was effected by the fourth article of that instrument, which declared that the free inhabitants of each of the States (paupers, vagabonds, and fugitives from justice excepted) should be entitled to all privileges and immunities of free citizens in the several States, and that the people of each State should have free ingress and egress to and from any other State, and should enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions and restrictions as the inhabitants thereof,

respectively. The Constitution organized a still more intimate Union, constituting the States, for all external purposes and for certain enumerated domestic objects, a single nation; but still the principle of State sovereignty was retained as to all subjects, except such as were embraced in the delegations of power to the General Government or prohibited to the States. The social *status* of the people, and their personal and relative rights as respects each other, the definition and arrangements of property, were among the reserved powers of the States. The provision conferring rights of citizenship upon the citizens of every State in every other State, was inserted substantially as it stood in the Articles of Confederation. The question now to be considered is, how far the State jurisdiction over the subjects just mentioned is restricted by the provision we are considering; or, to come at once to the precise point in controversy, whether it obliges the State governments to recognize, in any way, within their own jurisdiction, the property in slaves which the citizens of States in which slavery prevails may lawfully claim within their own States—beyond the case of fugitive slaves. The language is that they shall have the privileges and immunities of citizens, in the several States. In my opinion the meaning is, that in a given State, every citizen of every other State shall have the same privileges and immunities—that is, the same rights—which the citizens of that State possess. In the first place, they are not to be subjected to any of the disabilities of alienage. They can hold property by the same titles by which every other citizen may hold it, and by no other. Again, any discriminating legislation which should place them in a worse situation than a proper citizen of the particular State would be unlawful. But the clause has nothing to do with the distinctions founded on domicil. A citizen of Virginia, having his home in that State, and never having been within the State of New York, has the same rights under our laws which a native born citizen, domiciled elsewhere, would have, and no other rights. Either can be the proprietor of property here, but neither can claim any rights which under our laws belong only to residents of the State. But where the laws

of the several States differ, a citizen of one State asserting rights in another, must claim them according to the laws of the last mentioned State, not according to those which obtain in his own.

The position that a citizen carries with him, into every State into which he may go, the legal institutions of the one in which he was born, cannot be supported. A very little reflection will show the fallacy of the idea. Our laws declare contracts depending upon games of chance or skill, lotteries, wagering policies of insurance, bargains for more than 7 per cent per annum of interest, and many others, void. In other States such contracts, or some of them, may be lawful. But no one would contend that if made within this State by a citizen of another State where they would have been lawful, they would be enforced in our courts. Certain of them, if made in another State and in conformity with the laws there, would be executed by our tribunals upon the principles of comity; and the case would be the same if they were made in Europe or in any other foreign country. The clause has nothing to do with the doctrine of international comity. That doctrine, as has been remarked, depends upon the usage of civilized nations and the presumed assent of the legislative authority of the particular State in which the right is claimed; and an express denial of the right by that authority is decisive against the claim. How then, is the case of the appellant aided by the provision under consideration?

The Legislature has declared, in effect, that no person shall bring a slave into this State, even in the course of a journey between two slaveholding States, and that if he does, the slave shall be free. Our own citizens are of course bound by this regulation. If the owner of these slaves is not in like manner bound it is because, in her quality of citizen of another State, she has rights superior to those of any citizen of New York, and because, in coming here, or sending her slaves here for a temporary purpose, she has brought with her, or sent with them, the laws of Virginia, and is entitled to have those laws enforced in the courts, notwithstanding the mandate of our own laws to the contrary. But the position of the appellant proves too much.

The privileges and immunities secured to the citizens of each State by the Constitution are not limited by time, or by the purpose for which, in a particular case, they may be desired, but are permanent and absolute in their character. Hence, if the appellant can claim exemption from the operation of the statute on which the respondent relies, on the ground that she is a citizen of a State where slavery is allowed, and that our courts are obliged to respect the title which those laws confer, she may retain slaves here during her pleasure; and, as one of the chief attributes of property is the power to use it, and to sell or dispose of it, I do not see how she could be debarred of these rights within our jurisdiction as long as she may choose to exercise them. She could not, perhaps, sell them to a citizen of New York, who would at all events be bound by our laws, but any other citizen of a slave State—who would equally bring with him the immunities and privileges of his own State—might lawfully traffic in the slave property. But my opinion is that she has no more right to the protection of this property than one of the citizens of this State would have upon bringing them here under the same circumstances, and that the clause of the Constitution referred to has no application to the case. I concede that this clause gives to citizens of each State entire freedom of intercourse with every other State, and that any law which should attempt to deny them free ingress or egress would be void. But it is citizens only who possess these rights, and slaves certainly are not citizens. Even free negroes, as is well known, have been alleged not to possess that quality. In *Moore* v. *The State of Illinois*, already referred to, the Supreme Court of the United States, in its published opinion, declared that the States retained the power to forbid the introduction into their territory of paupers, criminals or fugitive slaves. The case was a conviction under a statute of Illinois, making it penal to harbor or secrete any negro, mulatto or person of color being a slave or servant owing service or labor to any other person. The indictment was for secreting a fugitive slave who had fled from his owner in Missouri. The owner had not intervened to reclaim him so as to bring the fugitive-law into

operation, and the case was placed by the court on the ground that it was within the legitimate power of State legislation, in the promotion of its policy, to exclude an unacceptable population. I do not at all doubt the right to exclude a slave as I do not consider him embraced under the provision securing a common citizenship; but it does not seem to me clear that one who is truly a citizen of another State can be thus excluded, though he may be a pauper or a criminal, unless he be a fugitive from justice. The fourth article of confederation contained an exception to the provision for a common citizenship, excluding from its benefits paupers and vagabonds as well as fugitives from justice; but this exception was omitted in the corresponding provision of the Constitution. If a slave attempting to come into a State of his own accord can be excluded on the ground mentioned, namely, because as a slave he is an unacceptable inhabitant, as it is very clear he may be, it would seem to follow that he might be expelled if accompanied by his master. It might, it is true, be less mischievous to permit the residence of such a person when under the restraint of his owner; but of this the Legislature must judge. But it is not the right of the slave but of the master which is supposed to be protected under the clause respecting citizenship. The answer to the claim in that aspect has been already given. It is that the owner cannot lawfully do anything which our laws do not permit to be done by one of our own citizens, and as a citizen of this State cannot bring a slave within its limits except under the condition that he shall immediately become free, the owner of these slaves could not do it without involving herself in the same consequences.

It remains to consider the effect upon this case of the provision by which power is given to Congress to regulate commerce among the several States. (*Art.* 1, § 8, ¶ 3.) If the slaves had been passing through the navigable waters of this State in a vessel having a coasting license granted under the act of Congress regulating the coasting trade, in the course of a voyage between two slave States, and in that situation had been interrupted by the operation of the writ of *habeas corpus,*

I am not prepared to say that they could have been discharged under the provision of the statute. So if in the course of such a voyage they had been landed on the territory of the State in consequence of a marine accident or by stress of weather. In either case they would, in strictness of language, have been introduced and brought into the State. In the latter case, their being here being involuntary, as regards the owner, they would not have been "brought here" within the meaning of the statute. (*Case of the brig Enterprize, in the decisions of the Commission of Claims, under the Convention of* 1853, *p.* 187.) But the case does not present either of these features. Its actual circumstances are these: Mrs. Lemmon being the owner of these slaves, at her residence in Norfolk, chose to take them to the State of Texas for a purpose not disclosed, further than that it was not in order to sell them. Geographically, New York is not on the route of such a voyage, but we can readily see that it would be convenient to bring them to that city from which vessels sail to most of the ports in the Union, to be embarked from thence in a ship bound to a port in the extreme southern part of the Union. This was what was actually done. She came with the negroes to New York by sea, in order to embark from thence to Texas; and when the writ of *habeas corpus* was served they were staying at a house in the city, ready to set out when a vessel should sail, and not intending to remain longer than should be necessary.

The act under consideration is not in any just sense a regulation of commerce. It does not suggest to me the idea that it has any connection with that subject. It would have an extensive operation altogether independent of commerce. It is not therefore within the scope of the decision of the Supreme Court in the passenger cases. (7 *How.*, 283.) In those cases the States of New York and Massachusetts had imposed taxes upon passengers arriving by sea at the ports of those States. The court considering the carrying of passengers coming here from foreign countries or being transported by sea between ports in different States, to be an operation of foreign and inter-state commerce, and holding moreover that the power to regulate

commerce was exclusively vested in Congress, declared those acts to be a violation of the Constitution of the United States. It may be considered as settled by those judgments that an act of State legislation acting directly upon the subject of foreign or inter-state commerce, and being in substance a regulation of that subject, would be unwarranted, whether its provisions were hostile to any particular act of Congress or not. But there is a class of cases which may incidentally affect the subject of commerce, but in respect to which the States are free to act until the ground has been covered by an act of Congress. State legislation upon these subjects is not hostile to the power residing in Congress to regulate commerce; but if Congress in execution of that power shall have enacted special regulations touching the particular subject, such regulations then become exclusive of all interference on the part of the States. This is shown by the case of *Wilson* v. *The Black Bird Creek Swamp Company* (2 *Pet.*, 250). The State of Delaware had authorized a corporation to erect a dam across a creek below tide-water, in order to drain a marsh. The validity of the act was drawn in question, on the ground that it was in conflict with the power of Congress to regulate commerce. The object of the work authorized by the State law was to improve the health of the neighborhood. In giving the opinion of the court, Chief Justice MARSHALL observed that "means to produce these objects (that is, health and the like), provided they do not come in collision with the powers of the General Government, are undoubtedly within those which are reserved to the States. But the measure authorized by this act stops a navigable creek, and must be supposed to abridge the rights of those who have been accustomed to use it. But this abridgment, unless it comes in conflict with the Constitution or a law of the United·States, is an affair between the government of Delaware and its citizens, of which this court can take no cognizance." "If Congress had passed any act which bore upon the case—any act in execution of the powers to regulate commerce, the object of which was to control State legislation over these small navigable creeks into which the tide flows—we should feel not much difficulty

in saying that a State law being in conflict with such act would be void. But Congress has passed no such act. The repug-nancy of the law of Delaware with the Constitution is placed entirely on its repugnancy with the power to regulate com-merce with foreign nations and among the several States—a power which has not been exercised so as to affect the ques-tion." The same principle has been affirmed in *Sturges* v. *Crowinshield* (4 *Wheat.*, 193), and in *Moore* v. *Houston* (5 *Wheat.*, 1); and since the Passenger cases, it has been reiterated in the Pilot case (*Cooley* v. *The Board of Wardens of Philadelphia*, 12 *How.*, 299). The application of the rule to the present case is plain. We will concede, for the purpose of the argu-ment, that the transportation of slaves from one slaveholding State to another is an act of inter-state commerce, which may be legally protected and regulated by federal legislation. Acts have been passed to regulate the coasting trade, so that if these slaves had been *in transitu* between Virginia and Texas, in a coasting vessel, at the time the *habeas corpus* was served, they could not have been interfered with while passing through the navigable waters of a free State by the authority of a law of such State. But they were not thus in transit at that time. Congress has not passed any act to regulate commerce between the States when carried on by land, or otherwise than in coast-ing vessels. But conceding that, in order to facilitate commerce among the States, Congress has power to provide for precisely such a case as the present—the case of persons, whose trans-portation is the subject of commercial intercourse, being carried by a coasting vessel to a convenient port in another State, with a view of being there landed, for the purpose of being again embarked on a fresh coasting voyage to a third port, which was to be their final destination—the unexercised power to enact such a law, to regulate such a transit, would not affect the power of the States to deal with the *status* of all persons within their territory in the meantime, and before the existence of such a law. It would be a law to regulate commerce carried on partly by land and partly by water—a subject upon which Congress has not thought proper to act at all. Should it do so

hereafter, it might limit and curtail the authority of the States to execute such an act as the present in a case in which it should interfere with such paramount legislation of Congress. I repeat the remark, that the law of the State under consideration has no aspect which refers directly to commerce among the States. It would have a large and important operation upon cases falling within its provisions, and having no connection with any commercial enterprise. It is then, so far as the commercial clause is concerned, generally valid; but in the case of supposable federal legislation, under the power conferred upon Congress to regulate commerce, circumstances might arise where its execution, by freeing a slave cargo landed on our shores, in the course of an inter-state voyage, would interfere with the provisions of an act of Congress. The present state of federal legislation however, does not, in my opinion, raise any conflict between it and the laws of this State under consideration. Upon the whole case, I have come to the conclusion that there is nothing in the National Constitution or the laws of Congress to preclude the State judicial authorities from declaring these slaves thus introduced into the territory of this State, free, and setting them at liberty, according to the direction of the statute referred to. For the foregoing reasons, I am in favor of affirming the judgment of the Supreme Court.

WRIGHT, J. No person can be restrained of his liberty within this State, unless legal cause be shown for such restraint. The *habeas corpus* act operates to remove the subject from private force into the public forum : and enlargement of liberty, unless some cause in law be shown to the contrary, flows from the writ by a legal necessity. (*Const., art.* 1, § 4; 2 *R. S.*, 563, § 21 ; *id.*, 565, § 39.) The restraint cannot be continued for any moment of time, unless the authority to maintain it have the force of law within the State.

In November, 1852, a writ of *habeas corpus* on behalf of eight colored persons, was issued by a Justice of the Superior Court in the city of New York, to inquire into the cause of their detention. The appellant showed for cause that they

were slaves of his wife in Virginia, of which State before that time he and his wife had been citizens and there domiciled, and that she held them as such in New York, in transit from Virginia through New York to Texas, where they intended to establish a new domicil. The return to the writ stated substantially that the route and mode of travel was by steamer from Norfolk, in Virginia, to the port of New York, and thence by a new voyage to Texas. In execution of this plan of travel, they and their slaves had reached the city of New York, and were awaiting the opportunity of a voyage to Texas, with no intention on their part that they or the eight colored persons should remain in New York for any other time, or for any other purpose, than until opportunity should present to take passage for all to Texas. The whole question, therefore, on these facts is, whether the cause shown was a legal one. If the relation of slave owner and slave which subsisted in Virginia between Mrs. Lemmon and these colored persons while there, by force of law attend upon them while commorant within this State in the course of travel from Virginia to Texas, and New York, though a sovereign State, be compelled to sanction and maintain the condition of slavery for any purpose, and cannot effect a universal proscription and prohibition of it within her territorial limits, then is legal cause of restraint shown : otherwise not.

The question is one affecting the State in her sovereignty. As a sovereign State she may determine and regulate the *status* or social and civil condition of her citizens, and every description of persons within her territory. This power she possesses exclusively ; and when she has declared or expressed her will in this respect, no authority or power from without can rightly interfere, except in the single instance of a slave escaping from a State of the Union into her territory ; and in this, only because she has, by compact, yielded her right of sovereignty. (*U. S. Const.*, art. 4, § 2.) She has the undoubted right to forbid the *status* of slavery to exist in any form, or for any time, or for any purpose, within her borders, and declare that a slave brought into her territory from a foreign

Lemmon v. The People.

State, under any pretence whatever, shall be free. If she has done this, then neither an African negro nor any other person, white or black, can be held within her limits, for any moment of time, in a condition of bondage. It cannot affect the ques‑ tion, that at some time in her history as a colony or State she has tolerated slavery on her soil, or that the *status* has ever had a legal cognition: for without regard to time or circumstances, the State may, at her will, change the civil condition of her inhabitants and her domestic policy, and proscribe and pro‑ hibit that which before had existed. I do not say that she may convert any description of her free inhabitants or citi‑ zens into slaves; for slavery is repugnant to natural justice and right, has no support in any principle of international law, and is antagonistic to the genius and spirit of republican government. Besides, liberty is the natural condition of men, and is world-wide: whilst slavery is local, and beginning in physical force, can only be supported and sustained by positive law. "Slavery," says Montesquieu, "not only violates the laws of nature and of civil society; it also wounds the best forms of government; in a democracy where all men are equal slavery is contrary to the spirit of the Constitution."

It is not denied that New York has effectually exerted her sovereignty to the extent that the relation of slave owner and slave cannot be maintained by her citizens, or persons or citi‑ zens of any other State or nation domiciled within her terri‑ tory, or who make any stay beyond the reasonable halt of wayfarers, and that this she might rightfully do. I will not stop here to inquire whether this is not virtually conceding the whole question in the case. It is urged that this is as far as the State had gone when the present case arose; and if I comprehend the argument rightly, as far as she can ever go without transcending restraints imposed upon her sovereignty by the Constitution of the United States, or violating the prin‑ ciples of the law of nations as governing the intercourse of friendly States. I shall show that neither of these propositions are maintainable, and that in the legislation of the State on the subject of slavery, the case of the *status* during transit has not

escaped its intent and effect; but that if it were otherwise, when the domestic laws reject and suppress the *status* as a civil condition or social relation, as matter of reason and authority it is never upheld in the case of strangers resident or in transit.

1st. How far has the State gone in the expression of her sovereign will, that slavery, by whatsoever casual access, or for whatsoever transient stay, shall not be tolerated upon her soil? When negro slavery was first introduced and established as an institution in the Colony of New York, is not easily traceable. It never had any foundation in the law of nature, and was not recognized by the common law. (*Somerset's case, Lofft's R.*, 1; *S. C.*, 20; *Howell's State Trials*, 2.) Yet it existed in the Colony by force of local law, and was continued by the same sanction in a mild form in the eastern part of the State, after New York became an independent sovereignty. The public sentiment, reason and conscience, however, continued to frown on it until, in 1817, steps were taken by the legislative department of the government to effect its total abolition before 1830. As indicative of the public sentiment, in 1820 the Legislature, with unanimity, adopted a resolution requesting our Representatives in Congress to oppose the admission of any State into the Union, without making the prohibition of slavery therein an indispensable condition of admission; and in the preamble to the resolution, recited that they considered slavery to be an evil much to be deplored. The statute of 1817, provided against importing, introducing, or bringing into the State, on any pretence whatever, except in certain cases therein specified, persons held as slaves under the laws of other States. Amongst these cases, was that of a person, not being an inhabitant of our State, who should be traveling to or from, or passing through the State. He might bring with him any person held by him in slavery under the laws of the State from which he came, and might take such person with him from the State of New York; but the person held in slavery should not reside or continue in our State more than nine months, and if such residence were continued beyond that time, such person should be free. These provisions

against introducing or bringing foreign slaves into the State, except in the case of an inhabitant of another State, temporarily sojourning in or passing through this State, were re-enacted in the revision of the Statutes in 1830, with this additional section : "Every person born within this State, whether white or colored, is free; every person who shall hereafter be born within this State shall be free, and every person brought into this State as a slave, except as authorized by this title, shall be free." (1 *R. S.*, 656, 657, § 6; *id.*, 659, § 16.) Here was an authoritative and emphatic declaration of the sovereign will, that freedom should be the only condition of all descriptions of persons, resident or domiciled within the State, and that no slave should be brought therein, under any pretence whatever, except by his master, an inhabitant of another State, who was traveling to or from, or passing through this State. Thus slavery was left without the support of even the municipal law, except in the instance of sojourners, and then only for a period of nine months, and slave owners of other States passing with their slaves through our own. But in 1841, the sanction of the municipal law even in these cases was taken away. The Legislature, in 1841, repealed all the sections of the Revised Statutes allowing slaves to be brought voluntarily into the State, under any circumstances, leaving the provisions still in operation, that no person held as a slave should be imported, introduced or brought into the State on any pretence whatever; and if brought in, should be free. (*Laws of* 1841, *ch.* 247.) That this legislation was intended to reach the case of the *transitus* of a slave in custody of an inhabitant of a slaveholding State claiming to be his owner, and to leave no legal basis for the *status* of slavery in any form or for any purpose to rest upon, within the limits of the State, is evident. By the law of 1830, the privilege was secured to the foreign slaveholder of temporarily sojourning in or passing through the State with his slaves. In 1841 this privilege is taken away by the affirmative action of the law-making power. So, also, by the law of 1830, any person who, or whose family, resided part of the year in this State, and part

of the year in any other State, might remove or bring with him or them, from time to time, any person lawfully held by him in slavery, into this State, and might carry such person with him or them out of it. This was denied by the Legisla·ture in 1841. The obvious intent and effect of the repealing act of 1841 was to declare every person upon the soil of this State, even though he may have been held as a slave by the laws of another State, to be free, except in the single instance of a person held in slavery in any State of the United States under the laws thereof, who should escape into this State. With the courtesy of this legislation, so far as it might operate to affect friendly intercourse with citizens of slaveholding States, as a judicial tribunal, we have nothing to do. We are only to determine the intent and effect of the legislation. It is but just, however, to the political power of the State, to remark, that it was not conceived in any spirit of irrational propagandism or partizanship, but to effectuate a policy based upon principle, and in accordance with public sentiment. The fact that it has been the law of the State for nearly twenty years, and through successive changes of the political power, is cogent proof that it rests upon the foundation of a public sentiment not limited in extent to any party or faction. The effect of the legislation was to render the civil condition of slavery impossible in our own society. Liberty and slavery, as civil conditions, mean no more than the establishment of law, and the means to enforce or protect the one or the other. As the *status* of slavery is sustained and supported exclusively by positive law (and this has been so held as to the *status* in Virginia by her courts), if we have no law to uphold it, but on the contrary, proscribe and prohibit it, it cannot exist for an instant of time within our jurisdiction. (4 *Munford's R.*, 209; 2 *Hen. & Munford*, 149.) Of course I mean with this qualifi·cation, that there is no duty or obligation in respect thereto, imposed on the sovereignty of the State by the Federal Constitution, or the rules of international law.

2d. Is there anything in the Federal Constitution to hinder the State from pursuing her own policy in regulating the social

and civil condition of every description of persons that are or may come within her jurisdictional limits, or that enjoins on her the duty of maintaining the *status* of slavery in the case of slaves from another State of the Union voluntarily brought into her territory? It ought not to be necessary at this day to affirm the doctrine, that the Federal Constitution has no concern, nor was it designed to have, with the social basis and relations and civil conditions which obtain within the several States. The Federal Constitution is but the compact of the people of separate and independent sovereignties, yielding none of the rights pertaining to those sovereignties within their respective territorial limits, except in a few special cases. This was the nature of the compact as explained by its framers and contemporaneous expounders, and since by the Federal Courts, although it has become common of late to strive to find something in this bond of Federal Union to sustain and uphold a particular social relation and condition outside of the range of the laws which give it vitality. (*Ex parte Simmons*, 4 *Wash. C. C. R.*, 396; *Groves* v. *Slaughter*, 15 *Pet.*, 508; *Prigg* v. *Commonwealth of Penn.*, 16 *Pet.*, 611, 625; *Strader* v. *Graham* 10 *How. R.*, 82, 93.) Although the *status* of African slavery had at some time been recognized in all of the original States, at the period of the formation of the Federal Constitution some of them had abolished the institution, and others were on the eve of abolishing it; whilst others were maintaining it with increasing vigor. There are but three sections in the whole instrument that allude to the existence of slavery under the laws of any of the States, and then not in terms but as explained by the light of contemporaneous history, and in such a way as to stamp the institution as local. These are the provisions apportioning federal representation and direct taxation (*U. S. Const.*, *art.* 1, § 2, *subd.* 3) in relation to "persons held to labor in one State, under the laws thereof, escaping into another" (*Const.*, *art.* 4, § 2) and restraining Congress, prior to 1808, from prohibiting "the migration or importation of such persons as any of the States now existing shall think proper to admit." (*Const.*, *art.* 1, § 9.) The latter provision,

it is known, was urged with much earnestness by the delegates from two or three of the Southern States, with the view to restrain Congress from prohibiting the foreign slave trade before 1808. In *Groves* v. *Slaughter* (15 *Pet.*, 506), Judge McLEAN thought the provision recognized the power to be in the States to admit or prohibit, at the discretion of each State, the introduction of slaves into her territory. He says: "The importation of certain persons, meaning slaves, which was not to be prohibited before 1808, was limited to such States then existing as shall think proper to admit them. Some of the States at that time prohibited the admission of slaves, and their right to do so was as strongly implied by this provision as the right of other States that admitted them." But the provision has long ceased to have any practical operation. Congress has prohibited the importation of slaves into any of the States of the Union, and the slave trade is declared to be piracy. The provision has no importance now, except it be to show, that in the view of the framers of the Constitution, slavery was local in its character; that the power over it belonged to the States respectively, and that it was not to be recognized or receive any aid from the federal authority; but on the contrary, by all the means it possessed, federal power, after 1808, was to be exerted to suppress it. The provision in respect to apportioning representation in Congress, alludes remotely and only impliedly to the fact that slavery existed in any of the States. The representative population was to be " determined by adding to the whole number of free persons including those bound to service for a term of years, and excluding Indians not taxed, three-fifths of all other persons." No duty or obligation was imposed on the States; nor is there the remotest sanction or recognition of slaves as property outside of the range of the territorial laws which treat them as such. The third provision is simply a consent of the State as parties to the federal compact to the reclamation of fugitives from service. In speaking of this clause, Judge STORY said, in delivering the opinion of the Supreme Court of the United States in *Prigg* v. *Commonwealth of Pennsylvania*: " By the general laws of nations, no nation

is bound to recognize the state of slavery as to foreign slaves found within its territorial dominions, when it is in opposition to its own policy and institutions, in favor of the subjects of other nations where slavery is recognized. If it does it, it is as a matter of comity and not as a matter of international right. The state of slavery is deemed to be a municipal regulation, founded upon and limited to the range of the territorial laws. This was fully recognized in Somerset's case, which was decided before the American Revolution. It is manifest, from this consideration, that if the Constitution had not contained this clause, every non-slaveholding State in the Union would have been at liberty to have declared free all runaway slaves coming within its limits, and to have given them entire immunity and protection against the claims of their masters; a course which would have created the most bitter animosities, and engendered perpetual strife between the different States. * *  · The clause was accordingly adopted into the Constitution by the unanimous consent of the framers of it; a proof at once of its intrinsic and practical necessity." The learned judge was right in saying that the clause, as it stands in the instrument, was adopted with entire unanimity; but it was not adopted as originally reported. There were many eminent and patriotic men in and out of the Convention, both north and south, that did not contemplate that slavery was to be perpetual in any of the States of the Union, and amongst these was the illustrious presiding officer of the Convention, from Virginia. It was certainly inconsistent with the principle that lies at the foundation of our government. In incorporating the fugitive slave provision in the Constitution, the Convention was careful not to do anything which should imply its sanction of slavery as legal. The provision, as originally reported, read, "legally held to service," and it was amended by striking out the word "legally" and made to read "held to service or labor in one State, under the laws thereof." (*See Journal*, 384; *Madison's Works*, 1558, 1589.)

So, also, the word "service" was substituted for "servitude," on motion of a delegate from Virginia; the latter being

descriptive of slaves. (3 *Madison's Works*, 1569.) The term "slave" is not used in the Constitution, and if the phrase, "a person held to service or labor in one State under the laws thereof," is to be construed as meaning slaves, then the Federal Constitution treats slaves as persons and not as property, and it acts upon them as persons and not as property, though the latter character may be given to them by the laws of the States in which slavery is tolerated. It is entirely clear that the Convention was averse to giving any sanction to the law of slavery, by an express or implied acknowledgment that human beings could be made the subject of property; and it is moreover manifest from all the provisions of the Constitution, and from contemporaneous history, that the ultimate extinction of slavery in the United States, by the legislation and action of the State governments (instead of adopting or devising any means or legal machinery for perpetuating it), was contemplated by many of the eminent statesmen and patriots who framed the Federal Constitution, and their contemporaries both north and south. The provision in relation to fugitives from service, is the only one in the Constitution that, by an intendment, supports the right of a slave owner in his own State, or in any other State. This, by its terms, is limited to its special case, and necessarily excludes federal intervention in every other. This has been always so regarded by the federal courts · and the cases uniformly recognize the doctrine, that both the Constitution and laws of the United States apply only to fugitives escaping from one State and fleeing to another; that beyond this the power over the subject of slavery is exclusively with the several States, and that their action cannot be controlled by the Federal Government. Indeed, the exclusive right of the State of Missouri to determine and regulate the *status* of persons within her territory, was the only point in judgment in the *Dred Scott* case, and all beyond this was *obiter*. (*Ex parte Simmons*, 4 *Wash. C. C. R.*, 396; *Groves v. Slaughter*, 15 *Pet.*, 508; *Strader v. Graham*, 10 *Howard*, 92.) Any other doctrine might prove more disastrous to the *status* of slavery than to that of liberty in the States, for, from

the moment that it is conceded that, by the exercise of any powers granted in the Constitution to the Federal Government, it may rightly interfere in the regulation of the social and civil condition of any description of persons within the territorial limits of the respective States of the Union, it is not difficult to foresee the ultimate result.

The provision of the Federal Constitution conferring on Congress the power to regulate commerce among the several States, is now invoked as a restraint upon State action. It is difficult to perceive how this provision can have any application to the case under consideration. It is not pretended that the persons claimed to be held as slaves were in transit to Texas as articles of commerce; nor that, being with their alleged owner, on board a coasting vessel, enrolled and licensed under the laws of Congress, such vessel was driven, by stress of weather or otherwise, into the navigable waters of this State. Indeed, the case showed that their owner had voluntarily brought them into the State; that taking passage from Norfolk to New York, his and their voyage in the coasting steamer had terminated, and he was sojourning in the city with them, awaiting the opportunity to start on a new voyage to Texas. It is certainly not the case of the owner of slaves, passing from one slave State to another, being compelled, by accident or distress, to touch or land in this State. In such case, probably, our law would not act upon the *status* of the slave, not being within its spirit and intention; but as Congress has not yet undertaken to regulate the internal slave trade, even if it has authority to do so, in no just sense could even such a case be said to raise the question of the right of federal intervention. But in no view can the provision empowering Congress to regulate commerce among the States affect the power of the respective States over the subject of slavery. Even those who have contended for the right in Congress, under the commercial power, as it is called, to regulate the traffic in slaves, among the several States, admit that it is competent for a State, with the view of effectuating its system of policy in the abolition of slavery, to entirely prohibit the

importation of slaves, for any purpose, into her territory. But apart from effectuating any object of police or promoting any rule of policy, the power over the whole subject is with the States respectively; and this was so declared by the Supreme Federal Court, in *Groves* v. *Slaughter* (15 *Pet.*, 508), a case in which it was attempted to be urged that a provision in the Constitution of Mississippi, prohibiting the importation of slaves into that State for sale, was in conflict with the commercial power of the Federal Government. As was said by Chief Justice TANEY, in that case, " each of the States has a right to determine for itself whether it will or will not allow persons of this description (slaves) to be brought within its limits from another State, either for sale or for any other purpose, and also to prescribe the manner and mode in which they may be introduced, and to determine their condition and treatment within their respective territories ; and the action of the several States upon this subject cannot be controlled by Congress, either by virtue of its power to regulate commerce, or by virtue of any other power conferred by the Constitution of the United States." The case of *Groves* v. *Slaughter* was deemed at the time to have settled the question against the right in Congress, under the commercial claim, to regulate the internal slave trade, or to interfere in any way with the power of the States to severally protect themselves, under any and all circumstances, against an external evil.

The constitutional provision that "the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States" (*U. S. Const.*, art. 4, § 2, subd. 1), is also invoked as having some bearing on the question of the appellant's right. I think this is the first occasion in the juridical history of the country that an attempt has been made to torture this provision into a guaranty of the right of a slave owner to bring his slaves into, and hold them for any purpose in, a non-slaveholding State. The provision was always understood as having but one design and meaning, viz., to secure to the citizens of every State, within every other, the privileges and immunities (whatever they

might be).accorded in each to its own citizens. It was intended to guard against a State discriminating in favor of its own citizens. A citizen of Virginia coming into New York was to be entitled to all the privileges and immunities accorded to the citizens of New York. He was not to be received or treated as an alien or enemy in the particular sovereignty.

Prior to the adoption of the Federal Constitution, and even under the Confederation, the only kind of citizenship was that which prevailed in the respective States. The Articles of Confederation provided " that the free inhabitants of each of the States (paupers, vagabonds and fugitives from justice excepted), should be entitled to all privileges and immunities of free citizens in the several States; and the people of each State should have free ingress and egress to and from any other State, and should enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions and restrictions as the inhabitants thereof, respectively." (*Art.* 4.) This article limited the right to the free inhabitants of the States, implying that there were inhabitants of the States in the Confederacy that were not free, and to whom the privileges and immunities were not extended. But when the framers of the Constitution came to re-model this clause, having conferred exclusive power upon the Federal Government to regulate commercial intercourse, and imposed the obligation upon the States, respectively, to deliver up fugitives escaping from service, and being unwilling, even impliedly, to sanction, by federal authority, the legality of the state of slavery, they omitted the provisions of the article in relation to commercial intercourse, and substituted for the words, " the free inhabitants of each State," the words, " the citizens of each State," and made the provision to read as it now stands in the Constitution. If the provision can be construed to confer upon a citizen of Virginia the privilege of holding slaves in New York, when there is no law to uphold the *status*, and the privilege is denied to our own citizens, then Judge STORY and the Federal Court fell into a grave error in the opinion, that if it were not for the fugitive slave provision, New York would have been at liberty to have

declared free all slaves coming within her limits, and have given them entire immunity and protection; and so, also, did Chief Justice TANEY mistake the character of the instrument, when declaring that there was nothing in the Constitution to control the action of a State in relation to slavery within her limits. But it seems a work of supererogation to pursue this inquiry. It never yet has been doubted that the sovereign powers vested in the State governments remain intact and unimpaired, except so far as they are granted to the government of the United States; and that the latter government can claim no powers which are not granted to it by the Constitution, either expressly or by necessary implication. There is no grant of power to the Federal Government, and no provision of the Constitution from which any can be implied, over the subject of slavery in the States, except in the single case of a fugitive from service. The general power is with the States, except as it has been specially limited by the Federal Constitution; and this special limitation has been rightly considered as a forcible implication in proof of the existence of the general power in the States. So it was considered in *Lunsford* v. *Coquillon* (14 *Martin's R.*, 403), a case arising in a slaveholding State, in which the authority of States was fully recognized to make laws dissolving the relation of master and slave. Such a construction of the Constitution and law of the United States, say that court, can work injury to no one, for the principle acts only on the willing, and *volenti non fit injuria*.

· 3d. Is the State, upon principles of comity, or any rule of public law, having force within the State, required to recognize and support the relation of master and slave, between strangers sojourning in or passing through her territory? The relation exists, if at all, under the laws of Virginia, and it is not claimed that there is any paramount obligation resting on this State to recognize and administer the laws of Virginia within her territory, if they be contrary or repugnant to her policy or prejudicial to her interests. She may voluntarily concede that the foreign law shall operate within her jurisdiction, and to the extent of such concession, it becomes a

part of her municipal law. Comity, however, never can be exercised in violation of our own laws; and in deciding whether comity requires any act, we look to our own laws for authority. There can be no application of the principles of comity, when the State absolutely refuses to recognize or give effect to the foreign law, or the relation it establishes, as being inconsistent with her own laws, and contrary to her policy. The policy and will of the State in respect to the toleration of slavery, in any form, or however transient the stay, within her territory, has been distinctly and unmistakably expressed. Before the repealing act of 1841, our statutes operated to absolutely dissolve the relation of master and slave, and make the latter a freeman, except in the case of a master and slave, inhabitants of another State, temporarily in or passing through the State. In the latter cases, though the master could obtain no affirmative aid from the municipal law to enforce restraint of the liberty of the slave, yet the State, exercising comity, expressly permitted the relation to exist for the space of nine months. To this extent the State consented that the foreign law of slavery should have effect within her limits, and the relation of master and slave was not to be dissolved by force of the municipal law, unless the stay was continued beyond nine months. There can be no doubt that without this express exception, the statute of 1830 would have acted directly upon the *status* of any slave brought voluntarily into the State, and made him a freeman. As a matter of comity, however, the will of the State then was, that in the case of an inhabitant of another State passing through our territory with his slaves, the *status* of the latter should not be affected by our laws. But, in 1841, the State, by actual legislation, abrogated the permission accorded to slavery during transit, and declared it to be her will, that, under all circumstances, a slave voluntarily brought into the State should be free, and that the *status* should not be tolerated within her borders. It is for the State to establish the rule, and exercise comity, and not the courts in her behalf, and she may or may not, as she chooses, exercise it. The courts have

but the power of determining whether the comity inquired of be indicated by her policy and actual legislation. The State has declared, through her Legislature, that the *status* of African slavery shall not exist, and her laws transform the slave into a freeman the instant he is brought voluntarily upon her soil. Her will is that neither upon principles of comity to strangers passing through her territory, nor in any other way, shall the relation of slave owner and slave be upheld or supported. Instead, therefore, of recognizing or extending any law of comity towards a slaveholder passing through her territory with his slaves, she refuses to recognize or extend such comity, or allow the law of the sovereignty which sustains the relation of master and slave to be administered as a part of the law of the State. She says, in effect, to the foreign slave owner, if you bring your slaves within the State, on any pretence whatever, neither by comity nor in any other way shall the municipal law let in and give place to the foreign law; but the relation established and sustained only by the foreign municipal law shall terminate, and the persons before held as slaves shall stand upon her soil in their natural relations as men and as freemen. It is conceded that she may go to this extent if there be no restraint on her action by the Federal Constitution; and to this extent, I think, her policy and actual legislation clearly indicate that she has gone. But if there were no actual legislation reaching the case of slavery in transit, the policy of the State would forbid the sanction of law, and the aid of public force, to the proscribed *status* in the case of strangers within our territory. It is the *status*, the unjust and unnatural relation, which the policy of the State aims to suppress, and her policy fails, at least in part, if the *status* be upheld at all. Upon the same rule that she would permit the Virginia lady in this case to pass through her territory with slaves, she would be constrained to allow the slave trader, with his gang, to pass, even at the risk of public disorder which would inevitably attend such a transit. The State deems that the public peace, her internal safety and domestic interests, require the total suppression of a social condition that violates the law of

nature (*Virginia Bill of Rights*, §§ 1, 15); a *status*, declared by Lord MANSFIELD, in *Sommerset's case*, to be " of such a nature that it is incapable of being introduced on any reasons, moral or political;" that originates in the predominance of physical force, and is continued by the mere predominance of social force, the subject knowing or obedient to no law but the will of the master, and all of whose issue is involved in the misfortune of the parent; a *status* which the law of nations treats as resting on force against right, and finding no support outside of the municipal law which establishes it. (*Taylor's Elements of Civil Law*, 429; *Sommerset's case*, 20 *Howell's State Trials*, 2; 2 *Devereaux's R.*, 263.) Why should not the State be able to utterly suppress it within her jurisdiction ? She is not required by the rule of the law of nations, which permits the transit of strangers and their property through a friendly State, to uphold it. Men are not the subject of property by such law, nor by any law, except that of the State in which the *status* exists; not even by the Federal Constitution, which is supposed by some to have been made only to guard and protect the rights of a particular race; for in that human beings, without regard to color or country, are treated as persons and not as property. The public law exacts no obligation from this State to enforce the municipal law which makes men the subject of property ; but by that law the strangers stand upon our soil in their natural condition as men. Nor can it be justly pretended that by the principle which attributes to the law of the domicil the power to fix the civil *status* of persons, any obligation rests on the State to recognize and uphold within her territory the relation of slave owner and slave between strangers. So far as it may be done without prejudice to her domestic interests, she may be required to recognize the consequences of the *status* existing abroad in reference to subjects within her own jurisdiction ; and when it is brought within her limits, and is there permissible as a domestic regulation, to recognize the foreign law as an authentic origin and support of the actual *status*. (*Story's Confl. of Laws*, §§ 51, 89, 96, 113, 114, 104, 620, 624.) But no further than they are

consistent with her own laws, and not repugnant o: prejudicial to her domestic policy and interests, is the State · equired to give effect to these laws of the domicil.

My conclusions are, that legal cause was not shown for restraining the colored persons, in whose behalf the writ of *habeas corpus* was issued, of their liberty; and that they were rightly discharged. I have aimed to examine the question involved in a legal, and not in a political aspect; the only view, in my judgment, becoming a judicial tribunal to take. Our laws declare these persons to be free; and there is nothing which can claim the authority of law within this State, by which they may be held as slaves. Neither the law of nature or nations, nor the Federal Constitution, impose any duty or obligation on the State to maintain the state of slavery within her territory, in any form or under any circumstances, or to recognize and give effect to the law of Virginia, by which alone the relation exists, nor does it find any support or recognition in the common law.

The judgment of the Supreme Court should be affirmed.

DAVIES, BACON and WELLES, Js., concurred.

CLERKE, J. (Dissenting.) A considerable proportion of the discussion in this case was occupied by observations, not at all necessary to a proper disposition of it; nor were they calculated, in the slightest degree, in my opinion, to aid the court in solving the questions presented for its determination. Whether slavery is agreeable or in opposition to the law of nature; whether it is morally right or wrong; whether it is expedient or inexpedient; whether the African race are adapted, by their physical and moral organization, only to this condition; whether they can be induced to labor only by compulsion; whether the fairest and most fertile portions of the earth—those lying near and within the tropical zones—can alone be cultivated to any extent by that race, and whether, if without their labor, therefore, this large portion of the globe will, contrary to the manifest design of the Creator, continue

or become a sterile waste, are questions very interesting within the domain of theology, or ethics, or political economy, but totally inappropriate to the discussion of the purely legal questions now presented for our consideration. Those questions are, 1st, whether the Legislature of this State has declared that all slaves brought by their masters into this State, under any circumstances whatever, even for a moment, shall be free; and 2d, if it has so declared, had it the constitutional power to do so.

1. The act passed in 1817, and re-enacted in 1830, declares that no person held as a slave shall be imported, introduced, or brought into this State, on any pretence whatsoever, except in the cases therein specified, and that every such person shall be free. One of the excepted cases allows a person, not an inhabitant of this State, traveling to or from, or passing through this State, to bring his slave here and take him away again; but if the slave continues here more than nine months, he shall be free. These exceptions were repealed by an act passed May 25, 1841, amending the Revised Statutes in relation to persons held in slavery. Although there appears to be no ambiguity in the language of those acts, I am not surprised that some incredulity has been expressed in relation to their entire meaning. What, it may be plausibly asked, could be the object of the Legislature in interfering with persons passing through our territory? It is not to be supposed *a priori*, that any one member of the brotherhood of States would adopt any legislation for the purpose of affecting persons with whom, as a social or political community, it has no possible concern. If the slave were to remain here for any time, legislators may, indeed, fear some detriment, some demoralization from his presence; but what could the most nervous or fastidious guardians of the public interests apprehend from persons passing through the State. Neither could it add one jot or tittle to the sum of slavery in the world. To suppose, therefore, it may be said, that the acts referred to aimed at such persons, would be imputing a spirit of the most wanton aggression to the legislators who passed them. It would be mere propa-

gandism, of which we should not suppose any community capable, who were not in a condition of revolutionary excite- ment, and fanatical exaltation, like that of the French people. during their first revolution, when they undertook to force their theories of spurious democracy on the other nations of Europe, disturbing its peace for more than twenty years, and causing wide-spread slaughter and desolation. But, notwith- standing all these reasons, which may be plausibly suggested in considering the intent of the Legislature, the language of the acts referred to is too plain to admit of any doubt of that intent. It evidently intended to declare that all slaves vol- untarily brought into this State, under any circumstances whatever, should become instantly free.

2. But it is a question of much greater difficulty, whether the Legislature had the constitutional power to do so.

New York is a member of a confederacy of free and sove- reign States, united for certain specific and limited purposes, under a solemn written covenant. And this covenant not only establishes a confederacy of States, but also, in regard to its most material functions, it gives this confederacy the char- acter of a homogeneous national government. The Constitu- tion is not alone federal or alone national; but, by the almost divine wisdom which presided over its formation, while its framers desired to preserve the independence and sovereignty of each State within the sphere of ordinary domestic legisla- tion, yet they evidently designed to incorporate this people into one nation, not only in its character as a member of the great family of nations, but also in the internal, moral, social and political effect of the Union upon the people themselves. It was essential to this grand design that there should be as free and as uninterrupted an intercommunication between the inhabitants and citizens of the different States, as between the inhabitants and citizens of the same State. The people of the United States, therefore, "in order to form a more perfect union" than had existed under the old Confederacy, declare and provide, among other things in the Constitution under which we have now the privilege of living, that Congress

(alone) shall have power to regulate commerce among the several States; to establish a uniform rule of naturalization, and uniform laws on the subject of bankruptcies; to coin money as the genuine national circulating medium; to regulate its value; to fix the standard of weights and measures; to establish post-offices and post-roads; to promote the progress of science and the useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries. It also provides that no tax or duties shall be laid on articles exported from any State, and that no preference shall be given, by any regulation of commerce or revenue, to the ports of one State over another; that vessels bound to or from one State, shall not be obliged to enter, clear or pay duties in another; that full faith or credit shall be given in each State to the public acts, records and judicial proceedings of every other State, and that citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States. The people, in adopting this Constitution, declare in its very preamble that they intended to form a more perfect union than had bound them under the old Articles of Confederation, the fourth article of which declared that the better to secure and perpetuate mutual friendship and intercourse among the people of the different States, the free inhabitants of each State should be entitled to all the privileges and immunities of free citizens in the several States: that the people of each State should have free ingress to and from any other State, and should enjoy therein all the privileges of trade and commerce, as the inhabitants thereof respectively, subject to the same duties, impositions and restrictions; provided that those restrictions shall not extend so far as to prevent the removal of property, imported into any State, to any other State of which the owner is an inhabitant. Most assuredly, the people who adopted the present Constitution did not intend that the intercourse between the people of the different States should be more limited or restricted than the States, in their corporate capacity, provided in the Articles of Confederation. On the contrary, they contemplated, as we

have seen, a more perfect union, and a more perfect and unre-stricted intercourse; and they amply secured it by the provisions to which I have referred.

Is it consistent with this purpose of perfect union, and perfect and unrestricted intercourse, that property which the citizen of one State brings into another State, for the purpose of passing through it to a State where he intends to take up his residence, shall be confiscated in the State through which he is passing, or shall be declared to be no property, and liberated from his control? If he, indeed, brings his property voluntarily, with the design of taking up his residence in another State, or sojourning there for any purpose of business, even for a brief period, he subjects himself to the legislation of that State, with regard to his personal rights and the rights relating to property.

By the law of nations, the citizens of one government have a right of passage through the territory of another, peaceably, for business or pleasure; and the latter acquires no right over such person or his property. This privilege is yielded between foreign nations towards each other without any express compact. It is a principle of the unwritten law of nations.

Of course this principle is much more imperative on the several States than between foreign nations in their relations towards each other. For it can be clearly deduced, as we have seen, from the compact on which their union is based. Therefore, making this principle of the law of nations applicable to the compact which exists between the several States, we say, that the citizens of any one State have a right of passage through the territory of another, peaceably, for business or pleasure; and the latter acquires no right over such person or his property. But the judge who decided this case in the first instance (by whose reasoning, I may be permitted here to say, I was erroneously influenced in voting at the general term of the Supreme Court in the first district), while admitting the principle of the law of nations, which I have quoted, says that the property, which the writers on the law of nations speak of, is merchandise or inanimate things, and that the

principle, therefore, is not applicable to the slaves, who, by the law of nature and of nations, he contends, cannot be property. Foreign nations, undoubtedly, between whom no express compact exists, are at liberty to make this exception. But can any of the States of this confederacy, under the compact which unites them, do the same? Can they make this distinction? In other words, can any one State insist, under the federal compact, in reference to the rights of the citizens of any other State, that there is no such thing as the right of such citizens, in their own States, to the service and labor of any person. This is property; and whether the person is held to service and labor for a limited period, or for life, it matters not; it is still property—recognized as an existing institution by the people who framed the present Constitution, and binding upon their posterity forever, unless that Constitution should be modified or dissolved by common consent.

The learned judge who rendered the decision in the first instance in this case, would, of course, admit, on his own reasoning, that, if by the law of nations the right was recognized to property in slaves, the principle would apply to that species of property as well as to any other, and its inviolability would be upheld whenever its owner was passing with it through any territory of the family of nations. Can it be disputed that the obligations of the States of this Union towards each other are less imperative than those of the family of nations would be towards each other, if a right to this species of property was recognized by the implied compact by which their conduct is regulated. The position, therefore, of the learned judge, and of the general term, can only be maintained on the supposition that the compact which binds the States together does not recognize the right to the labor and service of slaves as property; and that each State is at liberty to act towards other States, in this matter, according to its own particular opinions in relation to the justice or expediency of holding such property. It may be, therefore, necessary more particularly, though briefly, to inquire what were and what had been the circumstances of the original States, in relation

to this subject, at the time of the adoption of the present Constitution; what was the common understanding in relation to it, as pointed out by the debates in the Convention, and what does the Constitution itself, by express provisions or necessary implication, indicate on this ever-important subject.

When this Constitution was adopted by the deliberate consent of the States and the people, slavery existed in every State, except Massachusetts and New Hampshire. It had existed in all the New England colonies from a very early period. The four colonies of Massachusetts Bay, Plymouth, Connecticut and New Haven, had formed a confederation, in which, among other things, they had stipulated with each other for the restoration of runaway servants, "and," to employ the language of Mr. Curtis (*History of the Constitution of the United States*, 2d vol., 453, 454), "there is undoubted evidence that African slaves, as other persons in servitude, were included in this provision. Slavery in Massachusetts had not been confined to Africans, but included Indians captured in war, and persons of our race condemned for crimes The early colonists of Massachusetts held and practised the law of Moses." "They regarded it," said the same writer in a note, "as lawful to buy and sell slaves taken in lawful war, or reduced to servitude by judicial sentence, and placed them under the same privileges as those given by the Mosaic law."

Slavery had not only existed for a long period in all the colonies, but at the time of the formation of the Constitution it was likely to continue to exist for a long time in the greater number of the States. In five of them the slave population, composed of the African race, was very numerous, while in the other States they were comparatively few. It was in this condition of things that the representatives of the States assembled to frame a Constitution for their more perfect union, and for the common preservation of their rights, not only from external attacks, but from internal aggression. Their deliberations began with the conviction and acknowledgment that property in slaves existed to a great extent in nearly all the States; and soon it became necessary to consider whether the slave popu-

lation should be included in the ratio of representation. They must be regarded, in order to make a satisfactory provision on this subject, indispensable to the completion of the Constitution, either as persons or as chattels, or as both. "In framing the new Union, it was equally necessary, as soon as the equality of the representation by States should give place to a proportional and unequal representation, to regard the inhabitants in one or the other capacity, or in both capacities, or leave the States in which they were found, and to which their position was a matter of grave importance, out of the Union. (*Curtis' Hist. Const. U. S.*, 20, 22.) And what was the resul of those convictions and deliberations? Undoubtedly, tha while slavery should be deemed a local institution, depending upon the power of each State to determine what persons should share in the civil and political rights of the community the right is fully recognized in the Constitution, that any of the States may continue and allow the right of property in the labor and service of slaves.

The portions of the Constitution more directly bearing on this subject are the 3d subdivision of the 2d section of the 1st article, and the 3d subdivision of the 2d section of the 4th article. The former relates to the apportionment of representatives and direct taxes, necessarily compelling a discrimination between the different classes of inhabitants. It was contended, on behalf of some of the northern States, that slaves ought not to be included in the numerical rule of representation. Slaves, it was contended, are considered as property, and not as persons, and, therefore, ought to be comprehended in estimates of taxation, which are founded on property, and to be excluded from representation, which is regulated by a census of persons. The representatives of the southern States, on the other hand, contended that slaves were not considered merely as property, but that they were also considered as persons; and Mr. Jay, in his paper on this subject in the Federalist, which, recollect, was published before the submission of the Constitution for ratification by the States, says "the true state of the case is, that they partake of both these qualities; being

considered by our laws in some respects as persons, and in other respects as property." "The Federal Constitution," he adds, "therefore decides with great propriety on the case of our slaves, when it views them in the mixed character of persons and property."

But in addition to this, if anything can be necessary, it has been adjudicated in the celebrated Dred Scott case, in a court whose decisions on this subject are controlling, that the Constitution of the United States recognizes slaves as property, and this is an essential element of the decision. Chief Justice TANEY, who delivered the opinion of the court, says:

"The only two provisions which point to them and include them, treat them as property, and make it the duty of the government to protect it no other power, in relation to this race, is to be found in the Constitution and as it is a government of special, delegated powers, no authority beyond these two provisions can be constitutionally exercised. The government of the United States had no right to interfere for any other purpose but that of protecting the rights of the owner, leaving it altogether with the several States to deal with this race, whether emancipated or not, as each State may think justice, humanity, and the interests and safety of society may require. The States evidently intended to reserve this power exclusively to themselves.

"No one, we presume, supposes that any change in public opinion or feeling, in relation to this unfortunate race, in the civilized nations of Europe or in this country, should induce the court to give to the words of the Constitution a more liberal construction in their favor than they were intended to bear when the instrument was framed and adopted. Such an argument would be altogether inadmissible in any tribunal called on to interpret it. If any of its provisions are deemed unjust, there is a mode prescribed in the instrument itself, by which it may be amended; but while it remains unaltered, it must be construed now as it was understood at the time of its adoption. It is not only the same in words, but the same in meaning, and delegates the same powers to the government, and reserves and secures the same rights and privileges to the citizen; and as long as it continues to exist in its present form, it speaks not only in the same words, but with the same meaning and intent with which it spoke when it came from the hands of its framers, and was voted on and adopted by the people of the United States. Any other rule of construction would abrogate the judicial character of this court, and make it the mere reflex of the popular opinion or passion of the day. This court was not created by the Constitution for such purposes. Higher and graver trusts have been confided to it, and it must not falter in the path of duty."

Moreover, besides the necessary implication from the avowed

purpose of the 3d subdivision of the 2d section, article 1st, of the National Constitution, the language itself recognizes the condition of slavery. It says: "Representatives and direct taxes shall be apportioned among the several States, which shall be included within this Union, according to their respective numbers, which shall be determined by adding to the whole number of free persons, including those bound to service for a term of years, and excluding Indians not taxed, three-fifths of all other persons." What other persons? The words are employed in direct contrast to free persons, and indisputably mean persons not free. It has been asserted, with an air of triumph, that the word "slave" is not employed in the Constitution. This was a matter of taste, I suppose, about which the members of the Convention did not think it worth while to contend. They had a higher and more practical purpose than to indulge any strife about a word; they were dealing with things—with realities; and, instead of calling those "slaves," who, in the apportionment of representatives and direct taxes, were to be added to free persons, they called them "other persons"—of course persons not free.

If, then, by the law of nations, the citizen of one government has a right of passage with what is recognized as property by that law, through the territory of another, peaceably, and that too without the latter's acquiring any right of control over the person or property, is not a citizen of any State of this confederacy entitled, under the compact upon which it is founded, to a right of passage through the territory of any other State, with what that compact recognises as property, without the latter's acquiring any right of control over that property.

Surely, this compact of sovereignties is not less obligatory on the parties to it, than is the law of nations on those who are subject to it. Is the one in derogation of the other? or does it not rather magnify and render more precise and tangible, and greatly extend, the duties and obligations imported by the law of nations? This inviolability of the slave property of the citizens of other States, while passing through the territory of free States, in analogy to the principle of the law

of nations, to which I have adverted, clearly in no way inter-
feres with the supreme authority of each State over those per-
sons and things that come within the range of its dominion.
By universal law, every sovereign and independent community
has complete and supreme dominion over every person and
thing within its territory, not there for the purpose of passing
through it, or not there in the capacity of ambassadors from
foreign nations, or their servants.

But, it is asserted, that the privilege accorded to the citizens
of one foreign nation to pass unmolested with their property
through the territory of any other, is founded merely on
comity. If by this is meant that the nation within whose ter-
ritory the property of a stranger is confiscated, is not respon-
sible for its acts in that respect, the idea is incorrect. Such an
act would be a valid cause for a resort to the only method by
which nations can obtain redress after remonstrance or nego-
tiation fails; but if it is meant that these words import that
the judicial tribunals can only administer the law as declared
by the law-making power of their own particular nation, and
the injured nation can only seek peaceable redress by appeal-
ing to the executive, and through it to the law-making power,
the proposition is correct. But, as I have shown, the relations
of the different States of this Union towards each other are of
a much closer and more positive nature than those between
foreign nations towards each other. For many purposes they are
one nation; war between them is legally impossible; and this
comity, impliedly recognized by the law of nations, ripens, in the
compact cementing these States, into an express conventional
obligation, which is not to be enforced by an appeal to arms,
but to be recognized and enforced by the judicial tribunals.

The error into which the judge who decided this case in the
first instance fell, consisted in supposing, because the law of
nations refused to recognize slaves as property, the several
States of this Union were at liberty to do the same; forgetting
that the compact, by which the latter are governed in their
relation towards each other, modifies the law of nations in
this respect; and while each particular State is at liberty to

abolish or retain slavery in reference to its own inhabitants and within its own borders, as its sense of right or expediency may dictate, it is not permitted in its dealings or intercourse with other States or their inhabitants to ignore the right to property in the labor and service of persons *in transitu* from those States- The Supreme Court having fallen into the same error, their order should be reversed.

To avoid the possibility of misapprehension, I will briefly recapitulate the positions which I hold in the foregoing opinion:

Every State is at liberty, in reference to all who come within its territory, with the intent of taking up their abode in it for any length of time, to declare what can or cannot be held as property. As, however, by the law or implied agreement which regulates the intercourse of separate and independent nations towards each other, all things belonging to the citizen of anyone nation, recognized as property by that law, are exempt in their passage through the territory of any other, from all interference and control of the latter; so, *a fortiori*, by the positive compact which regulates the dealings and intercourse of these States towards each other, things belonging to the citizen of any one State, recognized as property by that compact, are. exempt, in their passage through the territory of any other State, from all interference and control of the latter. The right to the labor and service of persons held in slavery, is incontestably recognized as property in the Constitution of the United States. The right yielded by what is termed comity under the law of nations, ripens, in necessary accordance with the declared purpose and tenor of the Constitution of the United States, into a conventional obligation, essential to its contemplated and thorough operation as an instrument of federative and national government. While the violation of the right yielded by what is termed comity under the law of nations, would, under certain circumstances, be a just cause of war, the rights growing out of this conventional obligation are properly within the cognizance of the judicial tribunals, which they are bound to recognize and enforce.

That portion of the act of the Legislature of this State

which declares that a slave brought into it belonging to a person not an inhabitant of it shall be free, is unconstitutional and void, so far as it applies to a citizen of any other State of this Union, where the right to property in the service and labor of slaves exists, who is passing through this State, and who has no intention of remaining here a moment longer than the exigencies of his journey require.

Comstock, Ch. J., observed in substance, that since the last term of the court, his time had been wholly occupied in an examination of other causes argued at that term. To this case, therefore, he had not yet been able to give the attention which its importance might justify. He had no hesitation in declaring it to be his opinion that the legislation of this State, on which the question in the case depends, is directly opposed to the rules of comity and justice which ought to regulate intercourse between the States of this Union; and he was not prepared to hold that such legislation does not violate the obligations imposed on all the States by the Federal Constitution. Without, however, wishing to delay the decision which a majority of his brethren were prepared to make, he contented himself with dissenting from the judgment.

Selden, J. I have been prevented, by want of time and the pressure of other duties, from giving to this case that careful examination which is due to its importance, and to the elaborate and able arguments of the counsel, and am not prepared, therefore, definitely to determine whether the act of 1841 is or is not in conflict with any express provisions of the United States Constitution. But however this may be, I cannot but regard it as a gross violation of those principles of justice and comity which should at all times pervade our inter-state legislation, as well as wholly inconsistent with the general spirit of our national compact. While, therefore, I am not prepared at this time to give such reasons as would justify me in holding the law to be void, I am equally unprepared to concur in the conclusion to which the majority of my associates have arrived.

Judgment affirmed.